Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: Rmoest@aol.com

*Counsel for Plaintiffs*

[Additional Counsel on Signature Page]

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMHITA GERA and DENISH BHAVSAR, derivatively on behalf of STEM, INC. f/k/a STAR PEAK ENERGY TRANSITION CORP., | Case No.: |
| Plaintiffs, | |
| v. | **DEMAND FOR JURY TRIAL** |
| JOHN CARRINGTON, ERIC SCHEYER, WILLIAM D. BUSH, MICHAEL D. WILDS, MICHAEL C. MORGAN, ADAM E. DALEY, ALEC LITOWITZ, DESIRÉE ROGERS, C. PARK SHAPER, DAVID BUZBY, ANIL TAMMINEEDI, LISA L. TROE, LAURA D'ANDREA TYSON, and JANE WOODWARD, | |
| Defendants, | |
| and | |
| STEM, INC. f/k/a STAR PEAK ENERGY TRANSITION CORP., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiffs Samhita Gera and Denish Bhavsar ("Plaintiffs"), by Plaintiffs' undersigned attorneys, derivatively and on behalf of Nominal Defendant Stem, Inc. f/k/a Star Peak Energy Transition Corp. ("Stem" or the "Company"), file this Verified Shareholder Derivative Complaint against Defendants John Carrington ("Carrington"), Eric Scheyer ("Scheyer"), William Bush ("Bush"), Michael D. Wilds ("Wilds"), Michael C. Morgan ("Morgan"), Adam E. Daley ("Daley"), Alec Litowitz ("Litowitz"), Desirée Rogers ("Rogers"), C. Park Shaper ("Shaper"), David Buzby ("Buzby"), Anil Tammineedi ("Tammineedi"), Lisa L. Troe ("Troe"), Laura D'Andrea Tyson ("Tyson"), and Jane Woodward ("Woodward"), (together, the "Individual Defendants," and collectively with Stem, "Defendants") for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), breaches of fiduciary duties, waste of corporate assets, unjust enrichment, and/or aiding and abetting thereof, and for contribution under Sections 10(b) and 21D of the Exchange Act and Section 11(f) of the Securities Act of 1933 (the "Securities Act"). As for Plaintiffs' complaint against the Individual Defendants, Plaintiffs allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Stem, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Company's current and former directors and the former officers and/or directors of legacy Stem, Inc. ("Legacy Stem") between December 4, 2020, through April 3, 2023, inclusive (the "Relevant Period").

2.      Stem purports to be a global leader in Artificially Intelligent ("AI")-driven clean energy solutions. The Company offers customers energy storage systems through its platform, Athena. Stem also delivers hardware services to its customers. Stem sources its storage systems from original equipment manufacturers ("OEMs").

3.      Prior to effectuating a business combination with Legacy Stem, resulting in the Company's current form, the Company was known as Star Peak Energy Transition Corp. ("STPK"). STPK operated as a blank check special purpose acquisition company ("SPAC"). STPK initiated its initial public offering ("IPO") on August 20, 2020. As a SPAC, the Company's purpose was to find a business with which to merge with, acquire, or otherwise combine within the energy and infrastructure sector in the United States.

4.      On December 4, 2020, the Company filed a current report on Form 8-K with several exhibits announcing that it entered into a definitive agreement to merge with Legacy Stem that would purportedly result in a $1.35 billion post-combined entity. The Company filed a registration statement in connection on December 17, 2020, on Form S-4 with the SEC (the "Registration Statement"), followed by a joint prospectus and proxy statement on Form 424B3 (the "Merger Proxy," and together with the Registration Statement the "Offering Documents"). On April 28, 2021, the Company consummated a business combination with Legacy Stem and STPK Merger Sub Corp. (the "Merger"), a private Delaware company founded in 2009, whereby the Merger Sub Corp. merged with Legacy Stem, and the surviving entity, Stem, adopted Legacy Stem's business and operations. The Company's leadership was also replaced in large part by Legacy Stem's leadership.

5.      One of Legacy Stem's touted advantages over other prospects in the energy and infrastructure market, as oft communicated by the Individual Defendants during the Relevant Period, was its "high-margin" software related services, which provided Legacy Stem (and hence, the post-Merger Company) persistent revenue via long-term service agreements with customers that ranged from 10 years to 20 years. Indeed, throughout the Relevant Period, certain of the Individual Defendants maintained that 100% of Stem's revenue from services came from this recurring business. However, unbeknownst to the shareholders who approved the Merger, (i.e., STPK's shareholders),

the value of the Merger was not in line with Defendants' representations leading up to and after the Merger. Rather, Defendants misleadingly touted the proposed Merger and Stem's prospects leading up to the Merger and thereafter, including in annual reports filed on Form 10-K with the SEC. For example, the Offering Documents contained false and misleading statements and omissions about Legacy Stem's internal controls over financial reporting, its and the post-Merger Company's business prospects and competitive standing, Legacy Stem's software revenue and the expected benefits that would result from its partnerships.

6.     The truth started to emerge on March 15, 2021, when the Company filed an amendment to the Registration Statement revealing material weaknesses in Legacy Stem's internal controls over financial reporting that had not previously been disclosed related to its accounting for "deferred cost of goods sold and inventory," "the review of certain revenue recognition calculations," and the "revenue of internal-use capitalized software calculations." On this news, the stock price dropped 3.36%, from a close of $35.43 per share on March 12, 2021, to close at $34.24 per share on March 15, 2021.  Nonetheless, the stock price remained artificially inflated given the undisclosed facts about the post-Merger business, prospects, revenues tied to software, and expected benefits stemming from Stem's partnerships.

7.     On March 30, 2021, Defendants solicited the Merger Proxy seeking shareholders to, *inter alia*, approve the Merger and an incentive plan that materially benefitted the Company's officers and directors. Specifically, the Merger Proxy sought shareholder approval of 5 proposals: (i) consider and approve the Merger; (ii) approve certain charter proposals; (iii) consider and vote to approve the issuance of shares on New York Stock Exchange ("NYSE") following the closing of the Merger and pursuant to agreements related to the merger; (iv) approve an incentive plan that provided a cap of $600,000 for director compensation and for incentive awards for employees and non-employee directors, including certain awards provided to officers on the close of the Merger; (v) and consider and vote upon a proposal to adjourn the special meeting to a later date if needed to permit further solicitation of proxies if there were not enough support for the Merger or the other proposals by the time of the special meeting.

Verified Shareholder Derivative Complaint

8.      As a result of the material misrepresentations and omissions made by the Individual Defendants in the Merger Proxy and statements leading up to the close of the transaction, shareholders were deceived into approving the unfavorable Merger given the true value of the Legacy Stem, the competitive standing and financial prospects of the post-Merger Company, and significant conflicts of interest, which ultimately harmed the Company and its investors and squandered Company assets (collectively, the "Overpayment Misconduct"). At all relevant times, the Individual Defendants, most of whom served as executives and/or directors at STPK or Legacy Stem, solicited the Merger Proxy, and were privy to information about the proposed transaction, its risks, and its expected benefits, knew or recklessly disregarded the true value of the Merger and its prospects in favor of their own self interests. Those at STPK sought to cash out on their investment in the Company rather than risk STPK's dissolution, which would render the warrants and/or shares they held in the Company utterly meaningless. Those a Legacy Stem were motivated by material benefits that they otherwise would not achieve without the Merger and the access to capital that came with it. For certain of the Individual Defendants, that included lucrative executive positions and packages; for others, it meant high compensation ceilings and consistent incentive awards for years to come.

9.      Still, shareholders and the public remained in the dark until well after the Merger closed. On February 24, 2022, Stem issued a press release announcing a strategic partnership with Available Power, LLC ("Available Power"), a company that developed distributed energy resources in the real estate market. The partnership would purportedly provide Stem upwards of $500 million and exclusive rights to 100 energy storage projects in Texas. Such an agreement was larger than the combined total of all the Company's prior projects. The Company credited the partnership to Athena, which it acquired in connection with the Merger. The arrangement thus confirmed the seeming strength of the Merger, including the financial prospects and revenue stream it provided to the Company and its investors.

10.      Later that same day, on February 24, 2022, after markets closed, Stem released markedly low financial results for the fiscal year ended December 31, 2021, including revenue of $127.4 million, which missed expected estimates by nearly $20 million. The results were also far

removed from the Company's guidance, provided in November 2021. As a result of this news, Stem's stock price declined by 21%, from a close of $11.24 per share on February 24, 2022, to close at $8.81 per share on February 25, 2022.

11.     On January 5, 2023, Stem disclosed that its "bookings backlog" for 2022 was partially offset by a "Stem-initiated contract cancellation" resulting from "partner non-performance [.]" The partner in question, was Available Power, the Company's touted customer.  On this news, Stem's stock price declined by 8.78%, from a close of $8.54 per share on January 4, 2023, to close at $7.79 per share on January 5, 2023.

12.     Then, on January 11, 2023, Blue Orca Capital ("Blue Orca") published a scathing report, revealing further information about Stem's software revenues, including that they did not account for 100% of the Company's revenues. In fact, the report found the opposite; that software revenues provided "a tiny fraction of reported" revenues. The report further asserted that the Company had financed its agreement with Available Power, which is what led to the partnership to begin with (rather than Athena). The Company issued a response to the report the next day. Notably, it failed to acknowledge or address several allegations including that the percentage of its software revenues was false and that it funded the Available Power partnership.

13.     On February 16, 2023, after markets closed, the Company reported disappointing financial results for the fourth quarter of 2022, revealing missed estimates and revenue of $156 million, among other things. On this news, the Company's stock price fell more than 14%, from a close of $9.74 per share on February 16, 2023, to close at $8.30 per share on February 17, 2023.

14.     At this point in time, the Company's stock price had plummeted 69.32% from its initial closing price of $27.05 per share, representing just how value destructive the Merger has been. Finally, on April 3, 2023, Bank of America downgraded the Company's stock from "neutral" to "underperform" and lowered its target price for Stem from $9 to $5. The next day, *Seeking Alpha* reported on Bank of America's analysis of Stem's stock. On April 4, 2023, the Company's stock dropped 7.4%, from a close of $5.91 on April 3, 2023, to close at $5.47 per share on April 4, 2023.

15.     All told, Defendants successfully deceived the investing public into approving the

Merger, and with it, lucrative arrangements that materially benefitted insiders at STPK and Legacy Stem to the Company's detriment. The full truth remained hidden from investors until well after the Merger closed and the value of the Company's securities tanked to new lows. As certain of the Individual Defendants had either a direct or indirect economic interest in founder shares or private placement units issued to them, detailed below, their financial interests were misaligned with those of the Company and its shareholders.

16. During the Relevant Period, the Individual Defendants caused the Company to make to the investing public a series of materially false and misleading statements regarding the business, operations, and prospects of the Company. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) Legacy Stem's business and competitive standing were overstated, particularly concerning its strategic partnerships and revenues tied to its software; (2) the post-Merger Company's business and financial prospects were also exaggerated; (3) the Company's software revenue did not account for 100% of its services revenue; and/or (4) there were supplementary weaknesses in Legacy Stem's internal controls over financial reporting regarding how Legacy Stem accounted for deferred costs of goods sold; revenue recognition; and certain software calculations used internally. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

17. The Individual Defendants further breached their fiduciary duties and engaged in other misconduct to the Company's detriment and/or aided and abetted the same by engaging in, allowing and/or facilitating the Overpayment Misconduct. At the same time, five of the Individual Defendants profited by over $25 million in improper insider sales, undertaken with knowledge of non-public information.

18. Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

19. As a result of the Individual Defendants' misconduct, the Company and several of its current and/or former officers and directors have become the subject of a consolidated securities fraud

class lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action"). The Company is also faced with the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—and in connection, will have to expend many millions of dollars.

20.     In light of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of the Individual Defendants' liability in the Securities Class Actions, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), and Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9).

22.     Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act and the Securities Act.

23.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

24.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

25.     Venue is proper in this District because Stem's principal executive offices are in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

Verified Shareholder Derivative Complaint

## PARTIES

### Plaintiffs

26.     Plaintiff Samhita Gera is a current shareholder of Stem common stock. Plaintiff Gera has continuously held Stem common stock since purchasing it on February 23, 2021.

27.     Plaintiff Denish Bhavsar is a current shareholder of Stem common stock. Plaintiff Bhavsar has continuously held Stem common stock since purchasing it on January 29, 2021.

### Nominal Defendant Stem

28.     Stem is a Delaware corporation with principal executive offices at 100 California St., 14th Fl., San Francisco, CA 94111. Stem's common stock trades on the NYSE under the ticker symbol "STEM."

### Defendant Carrington

29.     Defendant Carrington has served as a Company director and CEO since the close of the Merger in April 2021. He previously served as the CEO and director at Legacy Stem from December 2013. According to the Company's proxy statement filed on Schedule 14A with the SEC on April 21, 2023 (the "2023 Proxy Statement"), as of March 3, 2023, Defendant Carrington beneficially owned 2,973,886 shares of Company common stock. Given that the price per share of the Company's common stock was $8.79 when markets closed on March 3, 2023, Defendant Carrington beneficially owned approximately $26.1 million worth of Stem stock.

30.     For the fiscal year ended December 31, 2021, Defendant Carrington received $40,565,992 in total compensation from the Company, including $475,795 in salary, $37,815,664 in stock awards, $1,654,948 in option awards, $594,825 in non-equity incentive plan compensation, and $24,760 in all other compensation. For the fiscal year ended December 31, 2022, Defendant Carrington received $3,140,333 in total compensation from the Company, including $550,215 in salary, $999,999 in stock awards, $978,778 in option awards, and $611,340 in non-equity incentive plan compensation.

31.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Carrington made the following sales of Company stock:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| 3/20/2023 | 13,216 | $6.33 | $83,670 |
| 11/16/2022 | 28,570 | $13.82 | $394,837 |
| 11/17/2022 | 28,570 | $13.6 | $388,466 |
| 10/5/2022 | 28,570 | $13.71 | $391,723 |
| 10/6/2022 | 28,570 | $14.13 | $403,579 |
| 9/13/2022 | 28,570 | $16.12 | $460,605 |
| 9/14/2022 | 28,570 | $16.82 | $480,404 |
| 8/16/2022 | 28,570 | $16.25 | $464,233 |
| 8/17/2022 | 28,570 | $15.32 | $437,806 |
| 7/20/2022 | 28,570 | $8.92 | $254,844 |
| 7/21/2022 | 28,570 | $9.17 | $261,958 |
| 6/8/2022 | 28,570 | $9.34 | $266,929 |
| 6/9/2022 | 28,570 | $8.99 | $256,901 |
| 5/19/2022 | 28,580 | $7.73 | $220,951 |
| 5/20/2022 | 28,580 | $7.48 | $213,864 |
| 5/10/2022 | 5,198 | $7.32 | $38,049 |
| 12/8/2021 | 200 | $20 | $4,001 |
| 12/9/2021 | 19,621 | $20.11 | $394,578 |
| 12/1/2021 | 22,375 | $21.14 | $472,918 |
| 12/2/2021 | 6,401 | $20.36 | $130,311 |
| 11/17/2021 | 44,750 | $22.38 | $1,001,639 |
| 11/16/2021 | 44,750 | $24.55 | $1,098,791 |

Thus, in total, before the fraud was exposed, he sold 556,511 shares of Company common stock on inside information, for which he received approximately $8.1 million in proceeds. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

32.     The 2023 Proxy Statement stated the following about Defendant Carrington:

***John Carrington***. Mr. Carrington has served as our Chief Executive Officer and a member of our Board since the closing of the Merger in April 2021, and was our Chief Executive Officer and a member of the board of directors of Legacy Stem from December 2013 until the Merger. Mr. Carrington leads the energy storage and analytics movement at the Company. He has more than 25 years of leadership experience at technology, energy and industrial companies. In 2013, Mr. Carrington joined Stem from MiaSolé, the world's largest CIGS-based thin film solar company. From 2011 to 2013, he served as Chief Executive Officer and Director at MiaSolé. Prior to MiaSolé, from 2008 to 2009, he was the Executive Vice President of Marketing and Business Development at First Solar. From 1991 to 2008, Mr. Carrington worked at General Electric Company, most recently as General Manager and Chief Marketing Officer of GE Plastics. Mr. Carrington earned his B.S. in Economics from the University of Colorado.

Mr. Carrington is qualified to serve as a director due to his extensive executive experience in the energy and technology sectors. Additionally, as CEO of Stem, he possesses a deep knowledge of our business operations, financial strategy and operational strategy, as well as the industry, all of which enhance his contributions to our Board. The Board believes that Mr. Carrington's service as the Company's Chief Executive Officer is an important link between management and the Board, enabling the Board to perform its oversight function with the benefit of his perspectives on the Company's business and operations.

**Defendant Scheyer**

33.     Defendant Scheyer served as STPK's CEO and as a director of the Company from the time of its IPO until the close of the Merger in April 2021.

34.     According to the Merger Proxy, Defendant Scheyer beneficially owned 9,509,626 Founder Shares, comprised of Class Common B stock of the Company as of February 16, 2021, through his ownership interest and control over the Sponsor, representing 10.1% of the Company's shares as of that date.

35.     The Company's Merger Proxy stated the following about Defendant Scheyer:

**Eric Scheyer** serves as our Chief Executive Officer and on our board of directors and has served in these capacities since the IPO. Mr. Scheyer is a Partner at Magnetar and has served as the Head of the Magnetar Energy & Infrastructure

Group since inception. Mr. Scheyer is a member of Magnetar's management committee and investment committee, and Chairman of the Magnetar Energy & Infrastructure Group's investment committee. Mr. Scheyer has long-standing relationships and significant experience investing in the energy, energy infrastructure and renewables sectors. Mr. Scheyer serves on the board of Directors of Great Elm Capital Group, Inc. (NASD: GEC). Mr. Scheyer previously served on the board of managers of the general partner of Lightfoot Capital Partners, LP and the board of directors of Arc Logistics Partners LP. (NYSE: ARCX) Previously, Mr. Scheyer was a principal of Decorel Incorporated, where he served as President of Decorel S.A. de C.V. and Executive Vice President of Decorel Inc. until the sale of the company to Newell Rubbermaid. Mr. Scheyer received a B.A. from Trinity College.

**Defendant Bush**

36.     Defendant Bush has served as a Company director and as CFO since the close of the Merger in April 2021. He previously served as the CFO of Legacy Stem since November 2016. According to the 2023 Proxy Statement, as of March 3, 2023, Defendant Bush beneficially owned 771,514 shares of Company common stock. Given that the price per share of the Company's common stock was $8.79 when markets closed on March 3, 2023, Defendant Bush beneficially owned approximately $6.7 million worth of Stem stock.

37.     For the fiscal year ended December 31, 2021, Defendant Bush received $4,309,336 in total compensation from the Company, including $374,167 in salary, $2,938,958 in stock awards, $661,980 in option awards, $315,000 in non-equity incentive plan compensation, and $19,231 in all other compensation. For the fiscal year ended December 31, 2022, Defendant Bush received $2,479,221 in total compensation from the Company, including $425,712 in salary, $874,995 in stock awards, $856,424 in option awards, and $322,090 in non-equity incentive plan compensation.

38.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Bush made the following sales of Company stock:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| 11/15/2022 | 30,000 | $14.67 | $439,980.00 |
| 8/15/2022 | 60,642 | $ 6.47 | $998,652.00 |
| 8/16/2022 | 23,583 | $16.28 | $383,860.00 |
| 5/17/2022 | 37,284 | $7.62 | $284,141.00 |

| 5/10/2022 | 2,080 | $7.32 | $15,225.00 |
| 12/1/2021 | 10,000 | $21.13 | $211,320.00 |
| 12/2/2021 | 3,000 | $20.34 | $61,032.00 |
| 11/17/2021 | 12,456 | $22.35 | $278,391.00 |
| 11/16/2021 | 12,456 | $24.55 | $305,857.00 |

Thus, in total, before the fraud was exposed, he sold 191,501 shares of Company common stock on inside information, for which he received approximately $2.9 million in proceeds. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

39.     The 2023 Proxy Statement stated the following about Defendant Bush:

***William Bush***. Mr. Bush has served as our Chief Financial Officer since the closing of the Merger in April 2021, and served as the Chief Financial Officer of Legacy Stem from November 2016 until the Merger. Mr. Bush manages the Company's corporate and project financing efforts. Mr. Bush has served on the board of directors of Appreciate Holdings, Inc. (Nasdaq: SFR) since December 2022. From 2010 to 2016, Mr. Bush served as Chief Financial Officer of Borrego Solar Systems Inc., a solar and energy storage company. Mr. Bush has served as Chief Financial Officer for numerous high-growth solar, software and online media companies, and co-founded Buzzsaw.com, a spinoff of Autodesk, Inc., in 1999. Mr. Bush also served as Corporate Controller for Autodesk, Inc. (Nasdaq: ADSK), a software company, from 1997 to 1999 and previously worked for seven years in public accounting with Ernst & Young LLP and PricewaterhouseCoopers LLP. Mr. Bush earned his B.S. in Business Administration from the University of California, Berkeley and is a Certified Public Accountant.

**Defendant Wilds**

40.     Defendant Wilds served as the Company's CFO and CAO from the time of its IPO until the Merger closed in April 2021.

41.     The Company's Merger Proxy stated the following about Defendant Wilds:

**Michael D. Wilds** serves as our Chief Financial Officer and Chief Accounting Officer and has served in these capacities since the IPO. Mr. Wilds joined Magnetar in 2006, and is Chief Operating Officer of the Magnetar Energy & Infrastructure Group. Prior to joining Magnetar, Mr. Wilds served as the Chief Executive Officer of the affiliated companies of The Kansas Farm Bureau. Mr. Wilds also spent 20 years with Koch Industries, Inc. where he served in various senior roles, both domestic and international, including as Chief Financial Officer of Koch Industries International. Mr. Wilds earned a B.S. in Business Administration from Kansas State University.

**Defendant Morgan**

42.     Defendant Morgan has served as the Chairman of the Company's Board since August 2020. He also serves as Chair of the Compensation Committee. According to the 2023 Proxy Statement, as of March 3, 2023, Defendant Morgan beneficially owned 1,851,642 shares of Company common stock. Given that the price per share of the Company's common stock was $8.79 when markets closed on March 3, 2023, Defendant Morgan beneficially owned approximately $16.2 million worth of Stem stock. As disclosed in the Merger Proxy, like Defendant Scheyer, Defendant Morgan beneficially owned 9,509,626 Founder Shares, comprised of shares of Class Common B stock of the Company as of February 16, 2021, through his ownership interest and control over the Sponsor, representing 10.2% of the Company's shares as of that date

43.     For the fiscal year ended December 31, 2021, Defendant Morgan received $221,399 in total compensation from the Company, including $20,436 in fees earned or cash paid, and $200,963 in stock awards. For the fiscal year ended December 31, 2022, Defendant Morgan received $279,124 in total compensation from the Company, including $60,000 in fees earned or cash paid and $219,124 in stock awards.

44.     The 2023 Proxy Statement stated the following about Defendant Morgan:

***Michael C. Morgan***. Mr. Morgan has served as a member of our Board since the closing of the Merger in April 2021, and he served as the Chairman of the board of directors of STPK from August 2020 until the Merger. In 2008, Mr. Morgan co-founded Triangle Peak Partners, LP, a multi-strategy asset management firm focused on venture capital and growth equity, and he currently serves as its Chairman. Since 2004, Mr. Morgan has also served as President and Chief Executive Officer of Portcullis Partners, LP, a private investment partnership and limited partner of Triangle Peak Partners. Mr. Morgan has served as the lead independent director of Kinder Morgan, Inc. (NYSE: KMI), one of the largest energy infrastructure companies in North America, since 2011, and has served on the board of KMI and its predecessors since 2003. Mr. Morgan joined Kinder Morgan in 1997 and headed Kinder Morgan's corporate development efforts until 2001. He then served as President of KMI until 2004. Mr. Morgan has been a director of Sunnova Energy International, Inc. (NYSE: NOVA) since its initial public offering in June 2019, and served on the board of its predecessor (Sunnova Energy Corporation) from October 2015 until NOVA's initial public offering. Mr. Morgan was Chairman, and a member of the audit and compensation committees, of the board of directors of Star Peak Corp. II (NYSE: STPC) from January 2021 until its merger with Benson Hill in September 2021. Mr. Morgan is a frequent volunteer at Stanford University, and currently serves as co-

chair of the Precourt Energy Institute Advisory Council and on several other advisory committees. Mr. Morgan earned his B.A. in Economics and M.A. in Sociology from Stanford University and his M.B.A. from Harvard Business School.

Mr. Morgan is qualified to serve as a director due to his extensive experience in the energy infrastructure and clean energy sectors, corporate finance, capital markets and M&A, and corporate development and strategy, as well as his extensive experience as a director on other public company boards.

**Defendant Daley**

45.     Defendant Daley has served as a Company director since the IPO. He also serves as a member of the Audit Committee. According to the 2023 Proxy Statement, as of March 3, 2023, Defendant Daley beneficially owned 275,800 shares of Company common stock. Given that the price per share of the Company's common stock was $8.79 when markets closed on March 3, 2023, Defendant Daley beneficially owned approximately $2.4 million worth of Stem stock.

46.     For the fiscal year ended December 31, 2021, Defendant Daley received $220,548 in total compensation from the Company, including $19,585 in fees earned or cash paid, and $200,963 in stock awards. For the fiscal year ended December 31, 2022, Defendant Daley received $277,124 in total compensation from the Company, including $58,000 in fees earned or cash paid and $219,124 in stock awards.

47.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Daley made the following sales of Company stock:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| 8/11/2022 | 75,000 | $15.05 | $1,128,675.00 |
| 8/10/2022 | 75,000 | $14.79 | $1,109,475.00 |
| 12/2/2021 | 100,000 | $19.82 | $1,981,800.00 |
| 12/1/2021 | 100,000 | $21.14 | $2,113,500.00 |

Thus, in total, before the fraud was exposed, he sold 350,000 shares of Company common stock on inside information, for which he received approximately $6.3 million in proceeds. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

48.     The 2023 Proxy Statement stated the following about Defendant Daley:

*Adam E. Daley*. Mr. Daley has served as a member of our Board since the closing of the Merger in April 2021, and was a member of the STPK board of directors from 2020 until the Merger. He is a Partner at Magnetar Capital LLC, Co-Head of Magnetar's Energy & Infrastructure Group and a member of Magnetar Capital's Management Committee and Investment Committee. Since joining Magnetar Capital at its inception in 2005, Mr. Daley has been focused primarily on the sourcing, execution and management of various investments in the energy, energy infrastructure and renewables sectors. Prior to joining Magnetar Capital, Mr. Daley was an investment banker at Citigroup's Global Corporate and Investment Bank from 1999 to 2005. Mr. Daley has served as a member of the board of directors of Lightstar Renewables LL since 2023, PosiGen, Inc. since December 2021, Double Eagle Energy III, LLC since January 2018, Vesper Energy Development LLC since November 2020 and DoublePoint Energy, LLC since June 2018. Mr. Daley previously served as a director of Star Peak Corp. II (NYSE: STPC) from January 2021 to September 2021. Mr. Daley earned his B.S. in Finance with High Honors from the University of Illinois.

Mr. Daley is qualified to serve as a director due to his broad transactional experience in the energy, energy infrastructure and renewables sectors, his strong strategic focus and his financial expertise, all of which enable him to make valuable contributions to Stem's financial and strategic planning and industry competitiveness.

**Defendant Litowitz**

49.     Defendant Litowitz served as a director of the Company from the time of its IPO until the close of the Merger in April 2021.

50.     According to the Merger Proxy, like Defendants Scheyer and Morgan, Defendant Litowitz beneficially owned 9,509,626 Founder Shares, comprised of shares of Class Common B stock of the Company as of February 16, 2021, through his ownership interest and control over the Sponsor, representing 10.2% of the Company's shares as of that date.

51.     The Merger Statement stated the following about Defendant Litowitz:

**Alec Litowitz** serves on our board of directors and has served on our board of directors since the IPO. Mr. Litowitz is the Founder, Chief Executive Officer and Chairman of the Management Committee and co-head of the Investment Committee of Magnetar. Prior to founding Magnetar in 2005, Mr. Litowitz was a Principal at Citadel Investment Group and served as Global Head of Equities and a member of the Management and Investment Committees. Mr. Litowitz created and continues to be extensively involved with the Magnetar Capital UChicago Financial Education Initiative, an innovative high school-based financial education initiative, which has helped more than 22,000 students increase their financial literacy. Mr. Litowitz graduated from MIT with a B.S. in mathematics and anthropology and received a J.D. and M.B.A. from the University of Chicago.

**Defendant Rogers**

52. Defendant Rogers served as a director of the Company from the time of its IPO until the close of the Merger in April 2021. According to the Merger Proxy, Defendant Rogers beneficially owned 40,000 Founder Shares comprised of shares of Class Common B stock of the Company as of February 16, 2021.

53. The Merger Statement stated the following about Defendant Rogers:

**Desirée Rogers** serves on our board of directors and has served on our board of directors since the IPO. Ms. Rogers has been serving as the Chief Executive Officer and Co-Owner of Black Opal Beauty, LLC, a masstige makeup and skincare company for women of color sold in Walmart, CVS and Rite Aid as well as internationally since 2019. From 2013 to 2019, she served as the Chairman of Choose Chicago, the tourism agency for the city of Chicago with $1 billion in revenue and over 57 million visitors annually. Ms. Rogers was the first White House Social Secretary and Special Assistant to President Obama. Prior to this post, Ms. Rogers served as the President of Peoples Gas and North Shore Gas. Ms. Rogers is currently a member of the board of directors of Inspired Entertainment (INSE) and MDC Partners (MDC) as well as chairs the compensation committee of MDC. Ms. Rogers also serves on the board of non-for-profit, DonorsChoose, a group funding platform that grants over $120 million to public school teachers each year. She received a B.A. in Political Science from Wellesley College and an M.B.A. from Harvard Business School.

**Defendant Shaper**

54. Defendant Shaper served as a director of the Company from the time of its IPO until the close of the Merger in April 2021. According to the Merger Proxy, Defendant Shaper beneficially owned 40,000 Founder Shares comprised of shares of Class Common B stock of the Company as of February 16, 2021.

55. The Merger Proxy stated the following about Defendant Shaper:

**C. Park Shaper** serves on our board of directors and has served on our board of directors since the IPO. Mr. Shaper served in various management roles for the Kinder Morgan companies from 2000 until March 2013, when he retired as President of Kinder Morgan, Inc. (NYSE: KMI), Kinder Morgan Energy Partners, L.P., Kinder Morgan Management, LLC and as director and President of the general partner of El Paso Pipeline Partners, L.P. Since 2007, Mr. Shaper has served on the board of directors of Kinder Morgan, Inc., and he previously served on the boards of directors of Kinder Morgan G.P., Inc. (the general partner of Kinder Morgan Energy Partners, L.P.) and Kinder Morgan Management, LLC from 2003 to 2013. Mr. Shaper also serves on the board of directors of Sunnova (NYSE: NOVA) and

as a trust manager of Weingarten Realty Investors (NYSE: WRI). Mr. Shaper received an MBA from the J.L. Kellogg Graduate School of Management at Northwestern University and a B.S. in Industrial Engineering and a BA in Quantitative Economics from Stanford University.

**Defendant Buzby**

56.    Defendant Buzby has served as a Company director since the Merger closed in April 2021. He also serves as a member of the Compensation Committee. Prior to the Merger, he served as a director of Legacy Stem from April 2010. According to the 2023 Proxy Statement, as of March 3, 2023, Defendant Buzby beneficially owned 558,711 shares of Company common stock. Given that the price per share of the Company's common stock was $8.79 when markets closed on March 3, 2023, Defendant Buzby beneficially owned approximately $4.1 million worth of Stem stock.

57.    For the fiscal year ended December 31, 2021, Defendant Buzby received $238,003 in total compensation from the Company, including $37,040 in fees earned or cash paid, and $200,963 in stock awards. For the fiscal year ended December 31, 2022, Defendant Buzby received $318,124 in total compensation from the Company, including $99,000 in fees earned or cash paid and $219,124 in stock awards.

58.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Buzby made the following sales of Company stock:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|------|-------------|----------------------|----------|
| 9/9/2022 | 50,000 | $16.21 | $810,399.00 |
| 3/8/2022 | 86,121 | $9.01 | $775,950.00 |

Thus, in total, before the fraud was exposed, he sold 136,121 shares of Company common stock on inside information, for which he received approximately $1.5 million in proceeds. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

59.    The 2023 Proxy Stated stated the following about Defendant Buzby:

**David Buzby**. Mr. Buzby has served as member of our Board since the closing of the Merger in April 2021, and served on the Legacy Stem board of directors from April 2010 until the Merger. In April 2021 he was appointed Chairman of our Board.

Mr. Buzby has been on the board of directors of Spring Valley Acquisition Corp. II (Nasdaq: SVIIU) since its initial public offering in October 2022 and Climate Transition Capital Acquisition (AEX: CTCA1) since 2021. He served on the board of directors of Leading Edge Equipment Technologies from 2017 until 2023. Mr. Buzby served as a member of the Investment Committee at the PRIME Coalition from 2016 to 2022, and as Founder and Chief Executive Officer of Bright Plain Renewable Energy from 2011 to 2016. He previously served as a member of the board of directors of Cambrian Innovation Inc. from 2016 to 2020. He was a founding investor and former director of SunRun Inc. (Nasdaq: RUN) from 2008 to 2012, SunEdison, Inc. from 2004 to 2009, Valueclick, Inc. from 1998 to 2014, Prevalent Power, Inc. from 2003 to 2005, Resource Holdings from 1991 to 1998 and Best Internet from 1995 to 1999. Mr. Buzby also served as the Chief Executive Officer of SunEdison and Resource Holdings and Chief Financial Officer of Best Internet. Mr. Buzby earned his B.A. from Middlebury College and his M.B.A. from Harvard Business School.

Mr. Buzby is qualified to serve as a director due to his extensive experience in the climate transition sector and as a director on the boards of other public companies.

**Defendant Tammineedi**

60.     Defendant Tammineedi has served as a Company director since the Merger closed in April 2021. He also serves as a member of the Audit Committee and Nominating Committee. Prior to the Merger, he served as a director of Legacy Stem from 2019 and was a principal affiliate in one of Legacy Stem's investors, Angeleno Investors III, L.P. ("Angeleno") before the Merger. According to the 2023 Proxy Statement, as of March 3, 2023, Defendant Tammineedi beneficially owned 4,295,373 shares of Company common stock through his affiliation with Angeleno. Given that the price per share of the Company's common stock was $8.79 when markets closed on March 3, 2023, Defendant Tammineedi beneficially owned approximately $37.7 million worth of Stem stock.

61.     For the fiscal year ended December 31, 2021, Defendant Tammineedi received $222,251 in total compensation from the Company, including $21,288 in fees earned or cash paid, and $200,963 in stock awards. For the fiscal year ended December 31, 2022, Defendant Tammineedi received $281,124 in total compensation from the Company, including $62,000 in fees earned or cash paid and $219,124 in stock awards.

62.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Tammineedi made the following sales of Company stock:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| 8/18/2022 | 50,000 | $16.11 | $805,450.00 |
| 8/18/2022 | 50,000 | $16.11 | $805,450.00 |
| 8/15/2022 | 50,000 | $16.37 | $818,600.00 |
| 8/12/2022 | 50,000 | $15.37 | $768,450.00 |
| 8/10/2022 | 50,000 | $15.00 | $750,000.00 |
| 3/16/2022 | 150,000 | $8.30 | $1,245,450.00 |
| 3/11/2022 | 100,000 | $8.23 | $823,000.00 |

Thus, in total, before the fraud was exposed, he sold 500,000 shares of Company common stock on inside information, for which he received approximately $6 million in proceeds. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

63.    The 2023 Proxy Statement stated the following about Defendant Tammineedi:

*Anil Tammineedi*. Mr. Tammineedi has served as a member of our Board since the closing of the Merger in April 2021, and was a member of the Legacy Stem Board of Directors from 2019 until the Merger. He is a Partner at the Angeleno Group, LLC, a leading global investment firm focused on high-growth clean energy and climate solutions companies, where he has been leading investments across a number of sectors, including sustainable mobility, energy storage, resource efficiency and smart infrastructure since 2008. Prior to joining the Angeleno Group, Mr. Tammineedi served in various product development and management roles related to semiconductors targeting communications, mobile and power management applications at Broadcom Inc., a semiconductor company, from 1999 to 2006. Mr. Tammineedi has served as a member of the board of directors of Locana since 2016, and served as a director of Patriot Environmental Services, Inc. from 2016 until its acquisition in 2022. He also serves as a board observer at mPrest, Inc. Mr. Tammineedi has a M.S. from Iowa State University and an M.B.A. from the UCLA Anderson School of Management, where he serves as a Senior Faculty Advisor to the Business Creation Program and lectures on Impact Investing and Entrepreneurship. Mr. Tammineedi is also a Kauffman Fellow.

Mr. Tammineedi is qualified to serve as a director due to his extensive experience in the technology sector and with high-growth and clean energy companies, and as a director on the boards of other companies.

**Defendant Troe**

64.     Defendant Troe served as a Company director from April 2021 until she resigned in June 2023. She also served as Chair of the Audit Committee. According to the 2023 Proxy Statement, as of March 3, 2023, Defendant Troe beneficially owned 5,524 shares of Company common stock. Given that the price per share of the Company's common stock was $8.79 when markets closed on March 3, 2023, Defendant Troe beneficially owned approximately $48,555 worth of Stem stock.

65.     For the fiscal year ended December 31, 2021, Defendant Troe received $224,803 in total compensation from the Company, including $23,840 in fees earned or cash paid, and $200,963 in stock awards. For the fiscal year ended December 31, 2022, Defendant Troe received $287,124 in total compensation from the Company, including $68,000 in fees earned or cash paid and $219,124 in stock awards.

66.     The 2023 Proxy Statement stated the following about Defendant Troe:

**Lisa L. Troe**. Ms. Troe has served as a member of our Board since the closing of the Merger in April 2021. She was a Senior Managing Director of Athena Advisors LLC, from January 2014 to June 2021, a firm she co-founded to provide services in securities litigation, public company accounting, financial reporting and disclosure, compliance systems, enterprise risk management and other business needs and strategies. From 2005 to 2013, Ms. Troe was a Senior Managing Director at FTI Consulting, Inc. (NYSE: FCN), a global business advisory firm. From 1995 to 2005, Ms. Troe served on the Staff of the Division of Enforcement of the U.S. Securities and Exchange Commission's Pacific regional office, including seven years as a Branch Chief and six years as the Regional Chief Enforcement Accountant. Prior to joining the SEC, Ms. Troe was an auditor at a Big Four public accounting firm and held corporate accounting and financial positions in the oil and gas industry.

Ms. Troe serves as a director and a member or chair of the audit committee of (i) Magnite, Inc. (Nasdaq: MGNI), an independent platform that facilitates the purchase and sale of digital advertising, since February 2014; (ii) HireRight Holdings Corp (NYSE: HRT), which provides employers with global background screening and other workforce solutions, since March 2021; and (iii) Expro Group Holdings N.V. (NYSE: XPRO), an international oilfield services company that facilitates safer development of new energy and extends the longevity of resources production, since October 2021. She served as a director on private company boards in multiple industries and as an independent member of a public company board special committee. Ms. Troe is a member of the National Association of Corporate Directors and holds a CERT certification in cybersecurity from the Software Engineering Institute of Carnegie Mellon University. Ms. Troe earned her B.S. in Business Administration with Honors from the University of Colorado and is a Certified Public Accountant.

Ms. Troe is qualified to serve as a director due to her expertise in public company accounting, financial reporting and disclosure; public company governance and oversight; and enterprise risk management, as well as for the depth of her government and business experience, and her extensive public company board and audit committee experience. Ms. Troe also has diverse experience in a wide range of industries, allowing her to bring additional valuable perspectives to our Board.

**Defendant Tyson**

67.     Defendant Tyson has served as a Company director since the Merger closed in April 2021. She also serves as Chair of the Nominating Committee. According to the 2023 Proxy Statement, as of March 3, 2023, Defendant Tyson beneficially owned 5,524 shares of Company common stock. Given that the price per share of the Company's common stock was $8.79 when markets closed on March 3, 2023, Defendant Tyson beneficially owned approximately $48,555 worth of Stem stock.

68.     For the fiscal year ended December 31, 2021, Defendant Tyson received $219,696 in total compensation from the Company, including $18,733 in fees earned or cash paid, and $200,963 in stock awards. For the fiscal year ended December 31, 2022, Defendant Tyson received $276,124 in total compensation from the Company, including $57,000 in fees earned or cash paid and $219,124 in stock awards.

69.     The 2023 Proxy Statement stated the following about Defendant Tyson:

***Laura D'Andrea Tyson***. Dr. Tyson has been a member of our Board since the closing of the Merger in April 2021. She is a Distinguished Professor of the Graduate School and Professor Emeritus at the Haas School of Business at the University of California, Berkeley, and has served in this capacity since 2016. She has also been Chair of the Board of Trustees and Steering Committee Member of the Blum Center for Developing Economies since 2007, and is the Faculty Director of the Berkeley Haas Blockchain Initiative and the co-Faculty Director of the Sustainable and Impact Finance Initiative at the Haas School of Business since 2019. Dr. Tyson has also held a series of other positions at the University of California, Berkeley, including Professor of Business Administration and Economics at the Haas School of Business from 2007 to 2016, the Founder, Faculty Director and Interim Director of the Institute of Business and Social Impact from 2013 to 2020, Interim Dean of UC Berkeley's Haas School of Business from July 1, 2018 to December 31, 2018 and Dean of the Haas School from 1998 through 2001. She was also Dean of London Business School, University of London from 2001 through 2006.

Dr. Tyson has been a director of Lexmark International Inc. since 2017 and Apex Swiss Holdings, SARL since 2017. Dr. Tyson previously served on the board of directors of CBRE Group, Inc. (NYSE: CBRE) from 2010 to April 2022, AT&T Inc. (NYSE: T) from 1999 to 2020, Morgan Stanley (NYSE: MS) from 1997 to 2016 and Silver Springs

Networks, Inc. (NYSE: SSNI) from 2009 to 2018. Dr. Tyson has been a board member of the Haas School of Business since 2020, the Blum Center of Developing Economics since 2016, SeriousFun Children's Network since 2020, the Opportunity Institute since 2018, and the Sustainability Accounting Standards Board Foundation between 2017 and 2022.

Dr. Tyson has numerous advisory roles, such as Senior Advisor to the Rock Creek Group since 2009 and to the APAX Global Partners Fund since 2021. She is an Economic Advisor to the McKinsey Global Institute and a Global Economy Fellow for the MasterCard Center for Inclusive Growth since 2019, having acted as special advisor since 2016. Dr. Tyson was a member of the *Commission d'experts sur les grands défis économiques* for French President Emmanuel Macron since 2020. She has served as an advisory board member for APAX Global Impact since 2021 and Angeleno Group since 2018. She has served on the executive board of the Major League Baseball Professional Development League since 2022. She is the co-chair of the California Governor's Council of Economic Advisors. Other government roles include membership on the US President's Council of Advisors on Science and Technology (Working Group Member on Semiconductors) from 2016 to 2017, Secretary of State Foreign Affairs Policy Board and Council on Jobs and Competitiveness for the President of the U.S. from 2011 to 2013, Economic Recovery Advisory Board to the President of the U.S. from 2009 to 2011. She is a regular opinion columnist for Project Syndicate, an international media group that publishes pieces on its website and on numerous print publications around the world. Dr. Tyson was a member of President Clinton's cabinet from 1993 to 1996 and was the first woman to serve in the positions of Chair of the President's Council of Economic Advisors, from 1993 to 1995, and Director of the White House National Economic Council, from 1995 to 1996. Dr. Tyson received her B.A. from Smith College and holds a Ph.D. in Economics from the Massachusetts Institute of Technology.

Dr. Tyson is qualified to serve as a director due to her extensive public company board and governance experience, deep experience in the technology and energy industries, expertise in economics and public policy, her experience as an advisor in various business and political arenas, and her accomplishment at the highest levels of government service.

**Defendant Woodward**

70.     Defendant Woodward has served as a Company director since the Merger closed in April 2021. She also serves as a member of the Compensation Committee and Nominating Committee. According to the 2023 Proxy Statement, as of March 3, 2023, Defendant Woodward beneficially owned 5,524 shares of Company common stock. Given that the price per share of the Company's common stock was $8.79 when markets closed on March 3, 2023, Defendant Woodward beneficially owned approximately $48,555 worth of Stem stock.

71.     For the fiscal year ended December 31, 2021, Defendant Woodward received $220,548 in total compensation from the Company, including $19,585 in fees earned or cash paid, and $200,963 in stock awards. For the fiscal year ended December 31, 2022, Defendant Woodward received $277,124 in total compensation from the Company, including $58,000 in fees earned or cash paid and $219,124 in stock awards.

72.     The 2023 Proxy Statement stated the following about Defendant Woodward:

**Jane Woodward**. Ms. Woodward has served as a member of our Board since the closing of the Merger in April 2021. She is a Founding Partner of MAP Energy, LLC, a firm that focuses on energy investing and manages one of the largest private mineral portfolios in the U.S. She is a Managing Partner of WovenEarth Ventures, a boutique fund of funds focused on early-stage venture and niche project development. Ms. Woodward is also a member of the boards of directors of Fervo Energy, a geothermal project developer where she has served since 2021, Project Canary, an ESG data provider where she has served since 2021, and Ambient Fuels, a green hydrogen project developer where she has served since 2022. Ms. Woodward has also served as an adjunct professor of civil and environmental engineering at Stanford University since 1991 and has more than 30 years of experience developing and teaching energy classes. Ms. Woodward also serves on the Precourt Institute for Energy Advisory Council at Stanford University. Prior to founding MAP and teaching at Stanford, Ms. Woodward worked as an exploration geologist with ARCO Exploration Company and later as a petroleum engineering consultant to Stanford University's endowment. Ms. Woodward earned her B.A. in Geological Sciences from the University of California, Santa Barbara and her M.S. in Applied Earth Science and her M.B.A. from Stanford University.

Ms. Woodward is qualified to serve as a director due to her extensive private sector experience in numerous areas within the energy and renewables industries, as well as three decades of energy-related teaching experience.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

73.     By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally.

74.     Each director and/or officer of the Company owes to Stem and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

75.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein or aided and abetted the same.

76.     To discharge their duties, the officers and/or directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

77.     Each Individual Defendant at STPK leading up to the Merger, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of those Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by certain of the Individual Defendants who collectively comprised the Company's Board at all relevant times.

78.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants at STPK, and later Stem, had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to

cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

79.     To discharge their duties, the officers and/or directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and/or directors of the Company were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Stem's own Corporate Governance Guidelines and/or Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that the Company's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made

by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

80.     Each of the Individual Defendants further owed to the Company and the shareholders the duty of loyalty requiring that each favor the Company's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

81.     At all times relevant hereto, the Individual Defendants at STPK, and later Stem, were the agents of each other and of the Company and were at all times acting within the course and scope of such agency.

82.     Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

83.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

84.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

85.     The purpose and effect of the conspiracy, common enterprise, and/or common course

of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

86.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of STPK's board of directors and Legacy Stem's board of directors, each of the Individual Defendants who was an officer and/or director of STPK or Legacy Stem, and later, a director/officer of the post-Merger Company, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

87.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

88.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and/or of the Company or Legacy Stem and was at all times acting within the course and scope of such agency.

## THE COMPANY'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### Stem's Code of Conduct

89.     Under Stem's Code of Conduct, which applies to "each director, officer and employee" of the Company, all individuals associated are expected to "conduct themselves with the

highest degree of honesty and integrity at all times."

90.    The Code of Conduct provides that "[a]ny director, officer or employee who obtains information about a Code violation or illegal act has the responsibility to report the matter immediately" in the manner specified in the Code of Conduct.

91.    Under the sub-heading titled "Conflicts of Interest" the Code of Conduct maintains that:

Directors, officers, and employees should avoid activities that create or give the appearance of a conflict of interest between their personal interests and the Company's interests. A conflict of interest exists when a personal interest or activity of a director officer or employee could influence or interfere with that person's performance of duties, responsibilities, or commitments to the Company. A conflict of interest also exists when a director, officer or employee (or member of his or her family) receives an improper personal benefit as a result of his or her position at the Company.

92.    Under the sub-heading titled "Inside Information," the Code of Conduct provides:

While at the Company, you may also come into contact with another form of information that requires special handling and discretion. Inside information is material, nonpublic information about the Company or another company that, if made public, would be reasonably expected to affect the price of a company's securities or investment decisions regarding the purchase or sale of such securities. Employees must never use inside information to obtain any type of personal advantage, and should not disclose inside information to any third parties without the prior approval of senior management. For further discussion on our policy with respect to inside information, please review our Insider Trading Policy and Guidelines for Public Disclosures and Communications with the Investment Community, which are incorporated herein by reference.

93.    Under the heading titled "Company Disclosure Obligations," the Code of Conduct maintains that:

When disclosing information to the public, it is our policy to provide consistent and accurate information. To maintain consistency and accuracy, specific company spokespersons are designated to respond to questions from the public. Only these individuals are authorized to release information to the public at appropriate times. All inquiries from the media or investors should be forwarded immediately to the CLO or Chief Executive Officer ("CEO"). The CLO or the CEO must approve all press releases, speeches, publications, or other official Company disclosures in advance. Our internal control procedures are further regulated by the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"). The Sarbanes-Oxley Act was a U.S. legislative response to events at public companies involving pervasive breakdowns in corporate ethics and internal controls over financial reporting. It was designed to rebuild confidence in the capital markets by ensuring that public companies are operated in a

transparent and honest manner. Ensuring proper and effective internal controls is among the Company's highest priorities. We take seriously the reliance our investors place on us to provide accurate and timely information about our business. In support of our disclosure obligations, it is our policy to always:

- comply with generally accepted accounting principles;
- maintain a system of internal accounting and disclosure controls and procedures that provides management with reasonable assurances that transactions are properly recorded and that material information is made known to management;
- maintain books and records that accurately and fairly reflect transactions; and
- prohibit establishment of material undisclosed or unrecorded funds or assets.

94. Under the heading "Compliance with Laws, Rules and Regulations," the SRAC Code provides:

Compliance with both the letter and spirit of all laws, rules and regulations applicable to the Company, including any securities exchange or other organization or body that regulates the Company, is critical to our reputation and continued success. All employees, officers and directors must respect and obey the laws of the cities, states and countries in which the Company operates and avoid even the appearance of impropriety.

### ***Audit Committee Charter***

95. The Company's Audit Committee Charter provides that "[e]ach member of the Committee must be able to read and understand fundamental financial statements, including the Company's balance sheet, income statement and statement of cash flows [.]"

96. The purpose of the Audit Committee, as stated in the charter, is to, "at minimum":

- represent and act on behalf of the Board in discharging its oversight responsibility relating to: (a) the accounting and financial reporting processes of the Company, including the audits of the Company's financial statements and the integrity of the financial statements; (b) the Company's compliance with ethical, legal and regulatory requirements; (c) the outside auditor's qualifications and independence and (d) the performance of the Company's internal audit function and outside auditor; and

- oversee the preparation of the report of the Committee required by SEC Rules to be included in the Company's annual proxy statement.

97. The Audit Committee Charter further provides that committee members must, among other responsibilities:

29

Receive reports from management regarding, and review and discuss the adequacy and effectiveness of, the Company's disclosure controls and procedures.

\*\*\*

Review and discuss with management, the Company's earnings press releases and corporate practices with respect to earnings press releases and financial information, as well as earnings guidance provided to analysts and ratings agencies.

Review and discuss the Company's practices and policies with respect to risk assessment and risk management, including with respect to the Company's accounting and financial reporting processes, and also including any major financial risk exposures and steps taken by management to monitor and mitigate such exposures.

\*\*\*

Oversee the Company's compliance program with respect to legal and regulatory requirements, including the Company's code(s) of conduct and policies and procedures for monitoring compliance; and, at least annually, meet to review the implementation and effectiveness of the Company's compliance program with the Chief Legal Officer, who shall have the authority to communicate directly to the Committee, promptly, about actual and alleged violations of law or the Company's code(s) of conduct, including any matters involving criminal or potential criminal conduct.

### ***Corporate Governance Guidelines of the Board of Directors***

98.     The Company also maintains governance guidelines for its Board (the "Governance Guidelines"), which detail the Board's oversight function and responsibilities. Among the core responsibilities of the Board, are "reviewing the Company's major financial objectives, critical strategies and long-term plans, including major allocations of capital, significant proposed business acquisitions and divestures, operating performance, sustainability and stockholder returns;" "overseeing the assessment of major risks facing the Company," "overseeing the integrity of the Company's financial statements and the Company's financial reporting processes;" and "monitoring the effectiveness of the Company's corporate governance practices and making changes as necessary or appropriate for the Company."

99.     Under the heading titled "Long Range Plan and Annual Operating Plan; Strategic Planning" the Governance Guidelines state:

The objectives of the Long Range Plan ("LRP") and Annual Operating Plan ("AOP") are to highlight the growth plans and financial targets for the business, as well as key issues and risks to achieving these goals; determine the pace, magnitude and allocation of the Company's projected capital spending; and update the Company's anticipated operating expenses. The LRP and the AOP shall be presented, at a minimum, annually to the Board for review, input and, with respect to the AOP, approval. The Board shall monitor implementation of the LRP and AOP throughout the year.

100.    Under the heading titled "Conflicts of Interest," the Governance Guidelines state that:

Each director is expected to be familiar with and follow the Company's Code of Conduct. If an actual or potential conflict of interest develops, or a situation arises that might give the appearance of such a conflict, the director should immediately report the matter to the Secretary and to the Chairman of the Nominating Committee. If a director has a personal, business or professional interest in a matter before the Board or any of its committees, the director shall disclose the interest to the Board or such committee, excuse himself or herself from discussions on the matter, and not vote on the matter.

101.    In violation of the Code of Conduct, Audit Committee Charter, and Stem's Governance Guidelines, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to breaches of fiduciary duty by engaging in, effectuating, or aiding and abetting in the Overpayment Misconduct and violations of Section 14(a) of the Exchange Act. Defendants further failed to maintain the accuracy of Stem's public reports and other documents filed with the SEC, comply with laws and regulations, conduct business in an honest and ethical manner, and oversee the integrity of financial information provided to shareholders, the public, and any stock exchange.

102.    The Individual Defendants who were at the Company before the Merger conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to breaches of fiduciary duty and violations of Section 14(a) of the Exchange Act. These Defendants were also subject to similar ethical duties and responsibilities under STPK's guidelines and Code of Ethics. Nonetheless, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, including, for some, by engaging in improper insider trading, and failed to oversee the integrity of the Company's financial statements,

and maintain internal controls.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background of the Company

103.    Stem is an energy company that purports to be a global leader in AI-driven clean energy services and solutions aimed at maximizing the value of energy assets. Some of the services the Company provides include storage, solar and electronic vehicle charging. Stem also offers an enterprise platform, Athena, which integrates assets across the clean energy ecosystem and interfaces with other platforms to collect data. Athena utilizes proprietary applications to provide customers with various systems to track and manage their portfolios, among other things.

104.    Before April 28, 2021, the Company operated as a STPK, which was a SPAC intent on finding a company with which to merge or otherwise combine with in the energy and infrastructure sector in the United States. STPK was incorporated in Delaware on October 29, 2018. The Company's sponsor was Star Peak Sponsor LLC (the "Sponsor"), a Delaware limited liability company and its CEO was Defendant Scheyer, who also served as a director.

105.    The managing members of the Sponsor were Star Peak 19, LLC, Star Peak L LLC and Star Peak M LLC. Defendant Scheyer was the sole member of and controlled Star Peak 19, LLC, Defendant Litowitz was the sole member of and controlled Star Peak L LLC, and Defendant Morgan was the sole member and controlled Star Peak M LLC. Thus, Defendants Scheyer, Litowitz, and Morgan, which represented a majority of STPK's Board, were significantly interested in effectuating any business combination by dint of their ownership and control of the Sponsor.

106.    On November 8, 2018, the Sponsor purchased 2,875,000 shares ("Founder Shares") of Class B common stock for $25,000. On July 13, 2020, a stock split resulted in the Sponsor holding 10,062,500 Founder Shares. The Founder Shares would automatically convert into Class A common stock upon the consummation of a business combination. On July 29, 2020, the Sponsor transferred 40,000 to Defendants Rogers and Shaper, who were considered the independent directors on the STPK Board at the time.

107.   STPK undertook its initial public offering on August 20, 2020, offering 35,000,000 units at $10.00 per unit for gross proceeds of $350 million, excluding costs. That day, the net proceeds of the $350 million sale of units and concurrent private placements (described below) were placed in a trust account (the "Trust"). On August 26, 2020, STPK undertook an additional sale of 3,358,504 units at $10.00 per unit, generating $33.6 million in further proceeds, excluding costs. In conjunction with the offering, STPK also engaged in a private placement with the Sponsor, whereby the Sponsor obtained 6,733,333 and an additional 447,901 warrants at $1.50 each, generating gross proceeds of $10.1 million and $0.7 million. On August 26, 2020, $34.3 million of the net proceeds of the sale of units and warrants were placed into the Trust. Notably, the Company had until August 20, 2022 to effectuate a business combination, or STPK would be forced to liquidate, return funds in the Trust to its shareholders, and the Founder Shares would effectively be worthless.

108.   Legacy Stem was a private business founded in 2009 in California that designed solutions in the energy industry aimed at reducing costs and maximizing function. Legacy Stem's proprietary software platform was Athena, which purportedly provided the company with an edge over other energy storage providers who operated only with hardware.

**The Merger and Overpayment Misconduct**

109.   On August 21, 2020, after a representative from Goldman Sachs, STPK's agent, reached out to Defendant Carrington about Legacy Stem, Defendants Scheyer and Morgan met with a STPK representative to discuss Legacy Stem's business and the SPAC process. Representatives from both companies continued to engage and discuss a possible transaction between August 24, 2020, and August 28, 2020. Defendants Morgan, Scheyer, and Daley were involved in these discussions.

110.    On September 11, 2020, Defendant Morgan and Carrington discussed STPK's intent to present a term sheet for a proposed business combination following initial due diligence.

111.   On September 20, 2020, STPK sent initial terms to Legacy Stem, which included STPK's proposed consideration package of $650 million. Legacy Stem agreed on September 25,

2020, and STPK sent a preliminary term sheet. The same day, the STPK Board met and discussed the transaction and authorized the preliminary term sheet.

112.    Between September 26, 2020, and September 28, 2020, the parties fine tuned the terms of the preliminary term sheet, including by adding a minimum cash condition of $300 million, as Legacy Stem requested, and executed the document on September 28, 2020.

113.    Thereafter, STPK conducted some confirmatory business due diligence and engaged in numerous discussions with Legacy Stem's representatives.

114.    The Legacy Stem Board also met and discussed the proposed transaction between September 25, 2020, and December 2, 2020. Defendant Carrington also regularly communicated with the rest of the Legacy Stem Board to update them on the status of the business combination and discussions between STPK and Legacy Stem. On December 1, 2020, and December 3, 2020, specifically, Legacy Stem's Board met and discussed the terms of the Merger and the Merger, including STPK's valuation, the benefits and risks associated with the transaction, and the fiduciary duties of Legacy Stem's Board and management under Delaware law. On December 3, 2020, the Legacy Stem Board determined that it would be in Legacy Stem's best interest to effectuate the Merger. In reaching such conclusion, the Legacy Stem Board considered "its knowledge of Stem's business, operations, financial condition, earnings and prospects, and its knowledge of the financial and capital markets and the risks associated with pursing an IPO of Stem."

115.    The Company announced its definitive agreement to merge with Legacy Stem on December 4, 2020. Supposedly, the combined entity would be worth approximately $1.35 billion. The officers and directors of STPK and Legacy Stem had interests in the Merger that departed from the interests of other shareholders—particularly STPK shareholders. For example, in addition to the interests of STPK's officers and directors in cashing out on their Founder Shares:

> Stem's executive officers hold stock options to acquire Existing Stem Common Stock under the 2009 Plan. In addition, Stem's executive officers received grants of stock options under the 2009 Plan to acquire the following numbers of shares in recognition of their ongoing services in connection with the merger: Mr. Carrington — 950,000;   Mr. Triplett — 185,000;   Mr. Russo — 147,500; Mr. Bush — 462,500;   Mr. Johnson — 420,000;   and Mr. Patel — 462,500. These stock options are fully vested as of the date of this proxy statement/consent solicitation statement/prospectus. In addition, each of Messrs. Carrington, Bush and

Triplett also received additional grants of stock options under the 2009 Plan to acquire 3,634,841 shares, 1,587,868 shares and 19,840 shares, respectively. These stock options are scheduled to vest in annual installments of 25% over a four-year period, subject to the executive's continued employment. In connection with the merger, such stock options will be converted into stock options to acquire New Stem Common Stock.

116.   Shortly after announcing the anticipated Merger, on December 17, 2020, the Company filed the Registration Statement, which was declared effective on March 29, 2021. The following day, the Merger Proxy was filed. As admitted in the Merger Proxy, which was solicited by both STPK's Board and the Board of Legacy Stem, STPK's Board determined not to obtain a fairness opinion given their "substantial experience in evaluating the operating and financial merits of companies from a wide range of industries [.]"

117.   The Offering Documents were materially false and misleading, as discussed below, and created a false impression of Legacy Stem's business, prospects, and financial standing and resultingly, of the post-Merger Company. In truth, Legacy Stem suffered from serious internal control deficiencies over its financial reporting, its revenues from its software business were not nearly as strong as presented, and its platform, Athena, as well as its touted partnerships were overstated.

118.   On April 28, 2021, STPK effectuated the Merger, with STPK Merger Sub Corporation, a wholly owned subsidiary of the Company, merged into Legacy Stem. The surviving entity was Legacy Stem, which became a wholly owned subsidiary of the Company as of that date. In connection with the Merger, the Company changed its name to Stem, Inc. and undertook the business operations of Legacy Stem. The next day, Stem's shares and warrants started trading on the NYSE under the ticker symbols "STEM" and "STEM. WS" respectively. The transaction was comprised of $383 million in cash from the Trust and $225 million in cash from private investment in public equity, excluding transaction costs. Legacy Stem's former shareholders "rolled 100% of their equity holdings into the new public company."

119.   Most of the Individual Defendants, by virtue of their positions as officers and/or directors of STPK or Legacy Stem at the time, were in a position to know the state of Legacy Stem prior to the Merger in the course of conducting due diligence, and despite knowing of the prospects and competitive standing of Legacy Stem, they agreed to the Merger on terms that were unreasonable

given the true, yet undisclosed, state of affairs.

120.     In breach of their fiduciary duties to the Company, the Defendants at STPK engaged in the Overpayment Misconduct by causing STPK to acquire Legacy Stem on unfavorable terms to STPK's shareholders. Moreover, the Individual Defendants at STPK placed their own self-interest over the interest of the Company and the pre-Merger Company's shareholders, and agreed to the Merger on less favorable terms than were reasonable, given the poor state of Legacy Stem, which would only later become publicly known. Those at Legacy Stem, who later perpetuated the fraud as long as possible after the Merger, aided and abetted in this misconduct, which has damaged the Company.

**False and Misleading Statements**

***December 4, 2020 Conference Call***

121.     On December 4, 2020, the Company held a conference call with analysts and investors concerning the agreement to merge with Legacy Stem. Defendant Carrington, Legacy Stem's CEO at the time, stated during the call that Legacy Stem's business was ultimately "about the software," and that the "Athena software creates the super intelligence that drives these large lithium-ion batteries."

122.     In response to an analyst question about it meant to "be the first public pure play smart energy storage company" Defendant Carrington stated that: "Yeah. So, we provide clean energy battery solutions that allow our customers to reduce energy costs, reduce carbon emissions, and provide greater reliability for the grid. All of that is operated by our proprietary AI-driven software platform we call Athena."

***The Registration Statement***

123.     On December 17, 2020, the Company filed the Registration Statement with the SEC on Form S-4. The Registration Statement was signed by Defendants Scheyer, Wilds, Morgan, Daley, Litowitz, Shaper, and Rogers. The Registration Statement contained numerous false and misleading statements regarding Legacy Stem's business and value as a target for the Company to merge with. Among other things, the Registration Statement maintained that Legacy Stem provided customers

with storage solutions that it obtained from leading OEMs and entered into long-term arrangements with partners for "software-enabled services to operate the energy storage systems . . . utilizing the Athena platform [.]" Specifically, the Registration Statement stated in relevant part:

> Stem (i) provides its customers, which include commercial and industrial enterprises as well as independent power producers, renewable project developers, utilities and grid operators, with an energy storage system, sourced from leading, global battery original equipment manufacturers, that it delivers through its partners, including solar project developers and engineering, procurement and construction firms and (ii) Stem provides its customers, through its Athena artificial intelligence platform ("Athena"), **_with ongoing software-enabled services to operate the energy storage systems for 10 to 20 years_**. In addition, in all the markets where Stem operates its customers' systems, Stem has agreements to manage the energy storage systems utilizing the Athena platform to participate in energy markets and to share the revenue from such market participation.

(Emphases added.)

124.    In explaining why STPK was choosing Legacy Stem, the Registration Statement further provided that, based on the Company's "due diligence" investigations, that it was ideally situated to reap extensive benefits from merging with Legacy Stem, including from "increasing global initiatives to improve the efficiency of our energy ecosystems and reduce emissions" from a "digitally connected intelligent energy storage network":

> Based on its due diligence investigations of Stem and the industry in which it operates, including the financial and other information provided by Stem in the course of their negotiations in connection with the merger agreement, [the Company] believes that Stem aligns well with the objectives laid out in its investment thesis which focused on identifying a business that is a market leader in, and/or benefitting from the increasing global initiatives to improve the efficiency of our energy ecosystems and reduce emissions. Consistent with [the Company's] objectives, Stem's mission to provide a critical component of the global transition to renewable energy by means of its digitally connected intelligent energy storage network for its customers. As a result, [the Company] believes that a merger with Stem will provide [the Company's] stockholders with an opportunity to participate in the ownership of a publicly-listed company with significant growth potential at an attractive valuation.

125.    The Registration Statement maintained that Legacy Stem had "numerous partnerships with a diverse set of industry leaders to reduce execution risk and increase speed to the market in certain geographies" and had international partnerships "with leading regional industrial equipment

and energy firms . . . each focused on leveraging the partner's local market knowledge and reputation with leading corporates, utilities and grid operators."

126.    As far as the Company's future plans, the Registration Statement stated that the Company "intend[ed] to leverage our competitive strengths, technology leadership and market share position to build out the largest, digitally connected, AI-powered energy storage network, through" numerous strategies, including a "Continued Focus on Software Innovations," "Front-of-the-Meter Expansion," "International Market Growth," "More Favorable Supply Chain and Financing Terms," and "Additional Service Offerings."

127.    Moreover, the Registration Statement stated that "[w]e have significant in-house expertise in large utility scale projects and have developed a strategy to expand our team and technical capabilities for larger FTM [Front-of-the-Meter] opportunities"; that "[w]e have a history of innovation in the energy storage market through our development of an AI-powered storage technology and zero-money down financing"; that Legacy Stem "ha[s] built a sizeable leadership position"; and that "[w]e have additional end-market opportunities in other applications for storage such as electric vehicle charging ('EV') integration and power solutions."

128.    Regarding the Company's competitive position, the Registration Statement distinguished Legacy Stem from its peers, stating that: "industry transformation has created an opportunity for an increased role for energy storage solutions like ours"; "[w]e believe as one of the largest in this industry we have a significant head start against our competition in this rapidly evolving environment []"; and "industry peers are typically focused on the development and marketing of single-purpose built solutions with captive hardware offerings, while our AI-powered platform is capable of delivering a multitude of software enabled services operating an extensive and diverse network of energy storage systems across multiple geographies, utility and grid operator service areas."

129.    Additionally, the Registration Statement further highlighted Legacy Stem's Athena platform, among other things, stating that the Company was well-positioned for success:

> We believe that one of the key advantages driving sustainable differentiation for our
> company includes the focus and capabilities built in our pioneering history in the BTM

[Behind-the-Meter] segment of the energy storage industry. This experience required an emphasis on AI-driven co-optimization of energy storage operations and the build out of significant operational infrastructure to execute economic considerations for enterprise customers, utilities and grid operators. We believe that the distributed asset management capability from this experience positions us well to compete in the evolving FTM segment of the energy storage industry as recent regulatory actions include the liberalization and formalization of rules for compensation of market participation for distributed energy resources. We believe the legacy single-purpose market for FTM solutions will be driven by greater demand for flexible solutions that can access multiple market opportunities. Our solutions have been designed to mitigate the challenges of today's enterprise customers, independent power producers, utilities, renewable asset owners and the modern electrical grid at scale with continuous improvements to artificial intelligence optimization strategies informed by operational data from one of the industry's largest network of digitally-connected energy storage systems. We believe we are well-positioned to compete successfully in the market for energy storage hardware and software-enabled services. Despite our limited operating history, we are among the leaders in global distributed energy storage under management, supported by our Athena platform, compelling customer services, strategic partnerships and seasoned leadership team with a proven track record of success.

130.    The statements in the Registration Statement created a false image of Legacy Stem and the post-Merger Company's access to long-term agreements for AI-run services that suggested stable, substantial and continual revenues, considerable growth, and an edge compared to other market competitors in light of Legacy Stem's use of AI for its storage solutions. In truth, the actual and potential value of Legacy Stem's AI platform was exaggerated.

***March 4, 2021 10-K***

131.    On March 4, 2021, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2020 (the "2020 10-K"). The 2020 10-K was signed by Defendants Morgan, Scheyer, Wilds, Daley, Litowitz, Rogers, and Shaper and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the 2020 10-K's accuracy, which were signed by Defendants Scheyer and Wilds. Regarding the upcoming Merger, the 2020 10-K provided a general overview of the anticipated transaction and referred investors "to the preliminary proxy statement/consent solicitation statement/prospectus, as filed in Form S-4 with the [SEC] on January 22, 2021 for additional information." The 2020 10-K disclosed the following with respect to internal weaknesses in Legacy Stem's internal control over financial reporting:

Based on its assessment as of December 31, 2019, management has identified material weaknesses in its internal controls over financial reporting that we are currently working to remediate, which relate to (i) ineffective internal controls over accounting for complex and significant transactions, (ii) accounting for energy storage systems, (iii) ineffective internal controls over review of the Company's consolidated financial statements and related disclosures and (iv) a lack of formality in our internal control activities, especially related to management review-type controls. With respect to accounting for complex and significant transactions, deficiencies exist in our process for ensuring the completeness of information utilized in various technical accounting analyses and in certain instances, the proper application of the relevant accounting literature, including the determination of the appropriate valuation methodology. These deficiencies could result in material adjustments for certain transactions, including interest capitalization and accounting for convertible notes, accounting and valuation of embedded derivatives and warrant liabilities. With respect to energy storage systems, we did not properly track inflows and outflows, including the valuation of energy storage systems, due in part to the systems that the Company used to track and value energy storage systems. With respect to a lack of formality in our control activities, we did not sufficiently establish formal policies and procedures to design effective controls, establish responsibilities to execute these policies and procedures and hold individuals accountable for performance of these responsibilities. We had multiple control deficiencies aggregating to a material weakness over ineffective control activities.

132.    However, the statements in the 2020 10-K were materially false and misleading because, *inter alia*, they failed to account for supplementary material weaknesses in Legacy Stem's financial reporting of its accounts for deferred cost of goods sold, inventory, revenue calculations, and calculations related to its internal-use of its software.

### The Truth Starts to Emerge While False and Misleading Statements Continue

***March 15, 2021 Amendment to Registration Statement***

133.    On March 15, 2021, the Company filed a third amendment to its Registration Statement on Form S-4/A with the SEC, disclosing for the first time additional material weaknesses in Legacy Stem's internal control over financial reporting. The amendment specifically stated in relevant part:

Based on its assessment as of December 31, 2020, management has identified material weaknesses in its internal controls over financial reporting that we are currently working to remediate, which relate to [*inter alia*] . . . (ii) accounting for . . . deferred cost of goods sold and inventory . . . (v) ineffective internal controls over the review of certain revenue recognition calculations, and (vi) ineffective internal controls over the review of internal-use capitalized software calculations . . . . With respect to . . . inventory and deferred cost of goods sold, we did not properly track inflows and outflows, including the valuation of energy storage systems, due in part to the systems

that the Company used to track and value energy storage systems and inventory . . . .
[W]e did not sufficiently establish formal policies and procedures to design effective
controls, . . . including over review over revenue recognition and internal-use
capitalized software calculations.

134.    On this news, the Company's stock fell 3.36%, or $1.19 per share, from a close of
$35.43 per share on March 12, 2021, to close at $34.24 per share on March 15, 2021. Still, investors
and the public remained in the dark about the true value and prospects of Legacy Stem and the post-
Merger Company. Despite the aforementioned disclosure, Defendants continued to make false and
misleading statements leading up to the Merger and thereafter about the Company's prospects,
financial positioning, and anticipated benefits tied to partnership agreements.

### *Merger Proxy*

135.    On March 30, 2021, the Company filed the Merger Proxy with the SEC, which served
as a proxy statement, consent solicitation statement, and prospectus. The Individual Defendants
serving on the Legacy Stem Board and the Board of STPK solicited the Merger Proxy filed pursuant
to Section 14(a) of the Exchange Act, which contained material misstatements and omissions and
failed to correct prior misstatements.

136.    The Merger Proxy called for shareholders to: (i) consider and vote to approve the
proposed business combination with Legacy Stem; (ii) consider and vote on certain charter proposals
to amend the Company's certificate of incorporation and increase number of authorized shares from
400 million to 500 million and up to 1 million of new stem preferred stock, eliminate Class B common
stock classification in favor of single class structure, provide for increasing number of authorized
shares with a majority vote, provide for removal of directors for cause and by affirmative vote of 66
2/3 of voting power outstanding, provide for amendments to waiver of corporate opportunities, and
provide for vote of 66 2/3 to adopt/amend/repeal certain provisions in bylaws or certificate of
incorporation; (iii) consider and vote on proposal to approve issuance of shares on NYSE following
the closing of the Merger and pursuant to agreements related to the Merger; (iv) approve an incentive
plan proposal that would, *inter alia*, include a ceiling of $600,000 for director compensation and
provide for incentive awards for employees and non-employee directors, including certain awards
provided to officers on the close of the Merger (the "Incentive Plan"); and (v) consider and vote upon

a proposal to adjourn STPK's special meeting regarding the Merger and related proposals to a later date if needed to permit further solicitation of proxies if there further support for the Merger is needed or the other proposals by the time of the special meeting.

137.    The Incentive Plan would be administered by the Board or a designated Board committee and provided for initial one-time awards of restricted stock units ("RSUs") for Defendants Carrington and Bush of 1,370,000 shares as part of the Merger. Under a pre-existing incentive plan, certain of Legacy Stem's former executives also would have the right to cash out on prior awards of stock.

138.    Notably, the Incentive Plan proposal, charter proposals, and NYSE proposals were all conditioned on shareholder approval of the Merger.

139.    The Merger Proxy noted that shareholders of the Company would have the opportunity to redeem their shares in the $383.7 million Trust at a redemption price of about $10.13.

140.    The Merger Proxy repeated the same statements made in the Registration Statement regarding Legacy Stem's unique and attractive position as a target with which to merge, its competitive standing and software offerings, the experience of its leadership and its global reach, and accordingly, the prospects of the post-Merger Company.

141.    For example, the Merger Proxy stated that Legacy Stem had "numerous partnerships with a diverse set of industry leaders to reduce execution risk and increase speed to market in certain geographies"; and "[i]nternationally, . . . ha[s] partnered with leading regional industrial equipment and energy firms . . . each focused on leveraging the partner's local market knowledge and reputation with leading corporates, utilities and grid operators."

142.    The Merger Proxy also maintained that "[w]e intend to leverage our competitive strengths, technology leadership and market share position to build out the largest, digitally connected, AI-powered energy storage network, through" several strategies, including a "Continued Focus on Software Innovations", "Front-of-the-Meter Expansion", "International Market Growth", "More Favorable Supply Chain and Financing Terms", and "Additional Service Offerings".

143.    Like the Registration Statement, the Merger Proxy assured that "[w]e have significant

in-house expertise in large utility scale projects and have developed a strategy to expand our team and technical capabilities for larger FTM [Front-of-the-Meter] opportunities"; that "[w]e have a history of innovation in the energy storage market through our development of an AI-powered storage technology and zero-money down financing"; that Legacy Stem "ha[s] built a sizeable leadership position"; and that "[w]e have additional end-market opportunities in other applications for storage such as electric vehicle charging ('EV') integration and power solutions."

144.    Regarding competition, the Merger Proxy maintained that Legacy Stem's peers in the industry were "typically focused on the development and marketing of single-purpose built solutions with captive hardware offerings, while our AI-powered platform is capable of delivering a multitude of software-enabled services operating an extensive and diverse network of energy storage systems across multiple geographies, utility and grid operator service areas."

145.    Further highlighting the purported appeal of Legacy Stem and the prospects of the post-Merger Company, the Merger Proxy stated:

> We believe that one of the key advantages driving sustainable differentiation for our company includes the focus and capabilities built in our pioneering history in the BTM [Behind-the-Meter] segment of the energy storage industry. This experience required an emphasis on AI-driven co-optimization of energy storage operations and the build out of significant operational infrastructure to execute economic considerations for enterprise customers, utilities and grid operators. We believe that the distributed asset management capability from this experience positions us well to compete in the evolving FTM segment of the energy storage industry as recent regulatory actions include the liberalization and formalization of rules for compensation of market participation for distributed energy resources. We believe the legacy single-purpose market for FTM solutions will be driven by greater demand for flexible solutions that can access multiple market opportunities. Our solutions have been designed to mitigate the challenges of today's enterprise customers, independent power producers, utilities, renewable asset owners and the modern electrical grid at scale with continuous improvements to artificial intelligence optimization strategies informed by operational data from one of the industry's largest network of digitally-connected energy storage systems.
>
> We believe we are well-positioned to compete successfully in the market for energy storage hardware and software-enabled services. Despite our limited operating history, we are among the leaders in global distributed energy storage under management, supported by our Athena platform, compelling customer services, strategic partnerships and seasoned leadership team with a proven track record of success.

146.    The Individual Defendants caused the Merger Proxy to be materially false and misleading because it created a false impression of Legacy Stem's business, operations, and prospects and, relatedly, the value of the Company's investment and future post-Merger. The Merger Proxy failed to disclose, *inter alia*: (1) Legacy Stem's business and competitive standing were overstated, particularly concerning its strategic partnerships and revenues tied to its software; (2) the post-Merger Company's business and financial prospects were also exaggerated.

147.    The Merger Proxy explicitly maintained that the STPK Board unanimously supported the Merger as "fair to and in the best interests of STPK and its stockholders" based on, admittedly, their own assessment and experience, despite acknowledging their self-interests in the Merger, without the aid of a third-party valuation or fairness opinion.

148.    The Merger Proxy also disclosed the unanimous support and recommendation of the Board of Legacy Stem, who also solicited shareholder approval for the Merger and related proposals in the Merger Proxy. Under a section titled "Management of Stem After the Merger" the Merger Proxy maintained that the current executive officers and directors of Legacy Stem would become the executive officers and directors of the Company.

149.    As a result of the material misstatements and omissions contained in the Merger Proxy, Company shareholders voted to, among other things: (1) approve the Merger; and (2) approve the Incentive Plan, materially benefitting the Individual Defendants, who joined the post-Merger Company.

150.    Indeed, the Merger Proxy described certain benefits set aside for certain of the Individual Defendants upon the Merger's approval as follows:

> each named executive officer will receive a "Closing Grant" of time-based restricted stock units under the Incentive Plan with Messrs. Carrington, Bush and Johnson eligible to receive one million restricted stock units, 65,000 restricted stock units and 65,000 restricted stock units, respectively. In addition, Mr. Carrington will be eligible to receive a number of restricted stock units with a grant date fair value equal to approximately $2 million in each of 2021, 2022 and 2023. Messrs. Bush and Johnson will be eligible to receive a number of restricted stock units in 2021 with a grant date fair value equal to approximately $800,000, in the case of Mr. Bush, and $700,000, in the case of Mr. Johnson.

151.     Given the lack of appropriate and accurate disclosures in the Merger Proxy, STPK shareholders were unable to evaluate what they would receive in connection with any investment in the post-Merger Company. As many would come to know, those that failed to redeem their shares were duped into investing in a Company that was far less valuable than Defendants presented.

### *November 9, 2021 Conference Call and Press Release*

152.     On November 9, 2021, the Company hosted a conference call with analysts and investors concerning Stem's third quarter financial results for the 2021 fiscal year. During the call, in response to an analyst's question about whether Stem's service revenue line was 100% software related, Defendant Bush maintained "That is 100% software revenue."

153.     The same day, the Company issued a press release, reaffirming its gross profit guidance for the full-year 2021, stating in relevant part that "[t]he Company reaffirms its guidance of full-year 2021 revenue of $147 million and full year 2021 Adjusted EBITDA of $(25) million. Consistent with prior guidance, the Company reaffirms that it expects to recognize 50-60% of total 2021 revenue in Q4. The Company expects to provide 2022 guidance in its fourth quarter/full year 2021 earnings call in mid-to-late February 2022."

### *February 24, 2022 Press Releases and 2021 Financial Results*

154.     On February 24, 2022, the Company issued a press release announcing that it had been selected by Available Power to provide smart energy storage solutions in Texas. Available Power was described as "a developer that designs, develops, and deploys distributed energy resources and microgrid systems for commercial and industrial real estate." The "strategic" partnership was touted as a significant victory for Stem. The press release further stated, in relevant part:

> ***This strategic partnership gives Stem exclusive rights to provide its proprietary Athena® smart energy storage software to energy storage systems at 100 front-of-the-meter (FTM) sites*** throughout the state of Texas. ***The project portfolio is expected to have a value of more than $500 million and will be completed in phases, beginning with deployment of the first 20 systems by early 2023***. Together, Stem and AP will be providing the state grid, operating under the Electric Reliability Council of Texas (ERCOT), with an additional one gigawatt (GW), or two gigawatt-hours (GWh), of flexible electric power for 20 years.

ERCOT is responsible for delivering 90 percent of the state's electric power to more than 25 million people throughout Texas. The market for energy storage in ERCOT is expected to grow more than 10 GWh over the next five years as renewable energy adoption increases and the state prioritizes grid resilience.

AP will be facilitating the entire scope of work on the projects, from development of the energy storage sites, to marketing and selling the assets as they reach operation. Stem will provide the battery storage hardware at each site, incorporate Athena Bidder$^{TM}$ to optimize the bidding and dispatch of the systems (based on real-time market dynamics), and organize the portfolio of energy storage sites into a single, integrated energy intelligence platform. The full scope of Stem's software and services also includes revenue modeling, battery hardware consulting, and development support to successfully complete these projects.

(Emphasis added.)

155.    In a last bid before the public learned about more negative news, the press release, quoting Defendant Carrington, also maintained that:

"This partnership with Available Power showcases Stem's ability to support developers across the project lifecycle and enable best-in-class management of large portfolios of energy storage projects. Our market-leading Athena® software, advanced Bidder$^{TM}$ application, system operating knowledge, and ability to rapidly deploy projects will help Available Power quickly go to market and generate exceptional value."

156.    The statements in ¶¶152-155 were materially false and misleading as they failed to disclose, *inter alia*, that: (1) Legacy Stem's business and financial forecasts were exaggerated and Defendants facilitated or allowed the Overpayment Misconduct; (2) the post-Merger Company's business and financial prospects, including the touted benefits stemming from the Available Power were also overstated; and (3) the Company's software revenue did not account for 100% of its services revenue.

157.    The same day, after markets closed, the Company issued another press release revealing disappointing financial results for the fourth quarter and fiscal year ended December 31, 2021. The press release reported earnings per share of -$0.96 and revenue of $127.4 million, which missed consensus estimates by nearly $20 million. To soften the news, the press release highlighted the Company's purported strategic partnership with Available Power, misleadingly stating in relevant part that:

On February 24, 2022, the Company announced that it had been exclusively selected to provide storage solutions to Available Power, a developer of distributed energy resources. The strategic partnership will develop up to 100 FTM sites in Texas with potential to provide one gigawatt (GW), or two GWh, of energy storage systems and Athena software. The portfolio will be completed in phases, with deployment of the first 20 systems by early 2023.

158.    *Seeking Alpha* reported on the Company's "new 52 week low" and revenue miss the next day, on February 25, 2022, stating in relevant part:

Stem Inc. (STEM -19%) sinks to a new 52-week low after reporting a larger than forecast Q4 loss and record-high quarterly revenues that tripled from a year ago but missed analyst expectations.

Stem's Q4 net loss narrowed to $34.1M from last year's $100.9M loss but was still wider than the analyst consensus for an $11.6M loss.

* * *

"Supply chain, permitting and interconnection delays negatively impacted our fourth quarter revenues, but demand remains robust, and we expect these issues to resolve over time," [Defendant] Carrington said.

* * *

Stem shares have plunged 68% over the past year, including a 40% YTD decline.

159.    On this news, Stem's stock price declined by 21.62%, or $2.43 per share, from a close of $11.24 per share on February 24, 2022, to close at $8.81 per share on February 25, 2022.

### February 28, 2022 10-K

160.    On February 28, 2022, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2021 (the "2021 10-K"). The 2021 10-K was signed by Defendant Bush and non-party Rahul Shukla and contained SOX certifications signed by Defendant Carrington and Bush attesting to the 2021 10-K's accuracy. The 2021 10-K reiterated substantially the same representations made in the Registration Statement regarding Stem's future prospects, its supposed competitive advantages and international leadership in the energy storage arena. The 2021 10-K further disclosed the following about Stem's revenue line:

We generate service revenue and hardware revenue. Service revenue is generated through arrangements with host customers to provide energy optimization services using our proprietary cloud-based software platform coupled with a dedicated energy

storage system owned and controlled by us throughout the term of the contract. Fees charged to customers for energy optimization services generally consist of recurring fixed monthly payments throughout the term of the contract and in some arrangements, an installation and/or upfront fee component. We may also receive incentives from utility companies in relation to the sale of our services.

. . . . We separately generate services revenue through partnership arrangements by providing energy optimization services after the developer completes the installation of the project.

161.    Further, the 2021 10-K stated that, "[s]ervices revenue increased by $4.8 million primarily due to continued growth in host customer arrangements and partnership revenue related to services provided." Given that Defendant Bush had maintained that Stem's services revenue line was "100% software revenue [,]" these statements gave the false impression that Stem's purported increase in services revenue was solely a result of its software products and offerings.

162.    The statements in the 2021 10-K identified in ¶¶160-161 were materially false and misleading and failed to disclose material information about Stem's business, compliance, and operations. Specifically, the 2021 10-K failed to disclose that: (1) Legacy Stem's business and financial forecasts were exaggerated and Defendants facilitated or allowed the Overpayment Misconduct; (2) the post-Merger Company's business and financial prospects, including the touted benefits stemming from the Available Power were also overstated; (3) the Company's software revenue did not account for 100% of its services revenue, but included revenue from lower-margin businesses; and (4) Stem's arrangement with Available Power was secured through its own financing of the deal. At the time these statements were made, the Individual Defendants knew or recklessly disregarded that Stem's revenues were not 100% tied to its software sales and that the Company was funding the agreement with Available Power. Consequently, at all relevant times, the Company's public statements were materially false and misleading.

**The Truth Emerges**

163.    On January 5, 2023, Stem published an investor presentation prepared in connection with its participation at the Goldman Sachs Global Energy and Clean Technology Conference. The presentation revealed that Stem's "bookings backlog" for 2022 was partially offset by a "Stem-initiated contract cancellation [approximately $130 million]" resulting from "partner non-

performance on [an] agreed timeline [.]" Although undisclosed at the time, the partner in question was Available Power, the Company's oft-touted customer.

164.   On this news, Stem's stock price declined by 8.78%, or $0.75 per share, from a close of $8.54 per share on January 4, 2023, to close at $7.79 per share on January 5, 2023.

165.   A few days later, on January 11, 2023, Blue Orca published a report disclosing further information about Stem's software revenues, including that they did not account for 100% of the Company's revenues. In fact, the report found the opposite; that software revenues provided "a tiny fraction of reported" revenues.

166.   The report further asserted that the Company had financed its agreement with Available Power, which is what led to the partnership to begin with (rather than Athena). The Blue Orca report further stated in relevant part:

> STEM's stock trades at a premium on its claim that its low-margin hardware sales are accompanied by high-margin software revenues from its Athena AI platform, which STEM claims has a growing pipeline of recurring future revenues . . . . STEM's management stated unequivocally that "100%" of this services revenue line was from "software revenue." **In our view, this is a lie.** Rather, almost all of this services revenue is not from software, but from a legacy business under which STEM leases hardware to customers in what it calls "host customer arrangements." These arrangements, which STEM are winding down, are akin to hardware leases with a small software and services component, yet STEM tries to claim that 100% of the revenues from these contracts are software . . . . By disguising these low-margin, no-growth contract leases as software revenues, we think STEM fools
> investors into believing that STEM has a meaningful software business in order to garner a substantially higher valuation multiple.
>
> * * *
>
> For example, on an earnings call, STEM's CFO confirmed that "100%" of the service revenue line was "software revenue."
>
> * * *
>
> Likewise in its investor presentations, STEM labels these revenues as "software revenue."
>
> * * *
>
> Without hardware-leasing revenues masquerading as software revenues, STEM would be viewed as a low margin battery storage integrator whose primary business is charging developers a small markup on batteries purchased from OEMs. We think that STEM misleads investors about the true nature of its software revenues to inflate its stock price.

- **This Explains STEM's Shifting and Disappearing Disclosures**

We think STEM knows that this is terminal to its valuation, which is why STEM has stopped disclosing both partnership services and host customer revenues in recent periods.

Up until and including its Q3 2021 filing, STEM specifically broke out the portion of its "partnership service" revenue derived from services. We think that this is the best proxy for the revenue reasonably attributed to the supposedly unique and coveted "Athena AI" platform which STEM pitches to investors as the cornerstone of its burgeoning and coveted software business.

*Disaggregation of Revenue*

The following table provides information on the disaggregation of revenue as recorded in the consolidated statements of operations (in thousands):

| | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2021 | | 2020 | | 2021 | | 2020 | |
| Partnership hardware revenue | $ | 34,886 | $ | 5,523 | $ | 59,609 | $ | 6,950 |
| Partnership service revenue | | 33 | | — | | 112 | | — |
| Host customer service revenue | | 4,914 | | 3,649 | | 14,870 | | 10,711 |
| Total revenue | $ | 39,833 | $ | 9,172 | $ | 74,591 | $ | 17,661 |

Source: *STEM 10-Q Q3-2021*

\* \* \*

Then, in Q3 2022, STEM changed the labelling of its software segment from "service revenue" to **"services and *other* revenue."**

167.    Blue Orca further highlighted the Company's consolidated statements regarding "Disaggregation of Revenue" in 2021 and 2022, as well, noting that the Company's line-item report titled "Services and other revenue" for the three months and nine months ended September 30, 2022, stating:

What counts as "other" in this segment? STEM does not say. Yet the timing of the label change is notable. In Q3-2022, STEM's purported organic "software" segment grew 24% QoQ [quarter-over-quarter] to $6.6 million, the first time this segment had shown meaningful growth in 18 months. We suspect that the growth was driven not by organic software sales, but by the inclusion of other non-software service revenue in the segment, hence the label change.

168.    The report also shed light on Stem's purported partnership with Available Power, stating in relevant part:

**Undisclosed to Investors, STEM Finances Flagship Customer.** In February 2022, at the same time STEM announced a substantial earnings miss, it announced the signing of a flagship $500 million deal with Available Power, a new customer, for up to 1GW/2GWh of energy storage in Texas. Characterized by sell-side analysts as a "great win," the Available Power deal was so big that it was larger than STEM's total energy storage AUM at the time. The deal was supposedly an endorsement of STEM's software platform and evidence that STEM could compete for large utility-scale front-of-the-meter projects. Yet undisclosed to investors, interviews with a former STEM executive and solar industry experts revealed that STEM I contributing development capital to Available Power to finance the deal. The deal is just beginning, so the accounting details are murky, but we question whether STEM will use this arrangement to recognize revenues, profits and cash flows effectively paid for by STEM. Yet the larger point is that investors would have thought much differently about the flagship deal if they had known STEM is surreptitiously funding purchases from STEM. Rather than evidence that STEM can compete for utility-scale projects, we think this shows clearly that STEM cannot win big deals it doesn't pay for.

169.    The next day, on January 12, 2023, the Company issued a statement in response to the report. Stem's statement maintained:

**Software Revenues.** Our Host Customer agreements represented approximately $20 million of our total Services revenue in full-year 2021. These agreements represent ongoing software services where we optimize energy storage systems on behalf of our customers. These contracts are financed by third parties and are not classified as leases. Rather, these contracts are classified as services revenue in accordance with FASB ASU 2014-09 Topic 606, *Revenue from Contracts with Customers ("ASC 606")*.

We generated $36 million of services revenue through third quarter 2022, a 141% increase versus the nine months ended September 30, 2021, and our services revenue in third quarter 2022 grew 9% sequentially versus the second quarter of 2022.

We believe Contracted Annual Recurring Revenue (CARR) is a good proxy for the longterm value of the differentiated technology that we provide our customers. All additions to CARR represent contracted, high-margin software services. As previously disclosed, CARR was $61 million at the end of the third quarter 2022.

170.    Notably, Stem's response failed to directly acknowledge or address several of Blue Orca's findings including that the percentage of its software revenues was false and that it funded the Available Power partnership. Moreover, it clarified that Stem had "canceled . . . booking of approximately $135 million in the fourth quarter of 2022" which were "attributable solely to DevCo projects with Available Power. We have not recorded any revenue from any Available Power projects and there are no additional projects in the backlog with this former partner."

171.    On February 16, 2023, after markets closed, the Company issued a press release

51

reporting substandard financial results for the fourth quarter of 2022, again revealing missed estimates with reported revenue of $156 million, and 2023 guidance of $550 million to $650 million, among other things.

172.     *Seeking Alpha* reported on the Company's disappointing financial results the next day, stating, in relevant part:

> Stem Inc. (NYSE:STEM) -9.1% pre-market Friday after reporting Q4 revenues that missed estimates and FY 2023 guidance that disappointed investors.
>
> Q4 revenues hit a company record $156M that tripled year-ago results and surged 56% Q/Q, but the analyst consensus had forecast $166M; full-year revenues totaled a record $363M.
>
> Q4 net loss was $35.3M, compared to a net loss of $34.1M in the prior-year period; adjusted EBITDA was negative $10M vs. negative $12M in the year-ago quarter.
>
> Q4 bookings more than doubled from a year earlier to $458M, which exceeded the company's entire bookings for FY 2021, and the year-end backlog totaled nearly $1B.
>
> Cowen analysts said earnings were hurt by demand and logistical issues caused by China's COVID resurgence and the U.S. regulatory crackdown on solar, Bloomberg reported.
>
> For FY 2023, Stem (STEM) guided for revenues of $550M-$650M, mostly below analyst consensus of $647M, and an adjusted EBITDA of $5M-$35M.
>
> The company said it is "actively driving towards achieving positive adjusted EBITDA, which we continue to expect to occur in the second half of 2023."
>
> Stem (STEM) shares have gained 15% so far this year but fell 14.5% during the past year.

173.     On this news, the Company's stock price fell more than 14%, or $1.44 per share, from a close of $9.74 per share on February 16, 2023, to close at $8.30 per share on February 17, 2023.

174.     By that point, the Company's stock price had plummeted 69.32% from its initial closing price of $27.05 per share, representing just how value destructive the Merger has been.

175.     Finally, on April 3, 2023, Bank of America downgraded the Company's stock from "neutral" to "underperform" and lowered its target price for Stem from $9 to $5. The next day, *Seeking Alpha* reported on Bank of America's analysis of Stem's stock. On April 4, 2023, the

Company's stock dropped 7.4%, from a close of $5.91 on April 3, 2023, to close at $5.47 per share on April 4, 2023. The Company's stock price continues to trade at exceedingly low prices.

## DAMAGES TO STEM

176.    As a direct and proximate result of the Individual Defendants' misconduct, Stem has lost and will continue to lose and expend many millions of dollars.

177.    Such expenditures include, but are not limited to, fees associated with the Securities Class Action, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

178.    Such expenditures further include the amount STPK overpaid for Legacy Stem due to the misleading depiction of Legacy Stem's prospects, competitive position, and partnerships described herein.

179.    Such expenditures include payments to the Individual Defendants under the Incentive Plan, which was approved at least in part due to the false and misleading statements issued or caused to be issued by the Individual Defendants.

180.    Additionally, these expenditures include, but are not limited to, lavish compensation, benefits, and other payments provided to the Individual Defendants.

181.    As a direct and proximate result of the Individual Defendants' conduct, Stem has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and Individual Defendants' misrepresentations.

## DERIVATIVE ALLEGATIONS

182.    Plaintiffs bring this action derivatively and for the benefit of Stem to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' violations of Section 14(a) of the Exchange Act, breaches of fiduciary duties and other violations thereof, including aiding and abetting the same.

183.    Stem is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

184.     Plaintiffs are, and have been at all relevant times, shareholders of Stem. Plaintiffs will adequately and fairly represent the interests of Stem in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## **DEMAND FUTILITY ALLEGATIONS**

185.     Plaintiffs incorporate by reference and reallege each and every allegation stated above as if fully set forth herein.

186.     A pre-suit demand on the Board of Stem is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following seven individuals: Defendants Carrington, Morgan, Daley, Buzby, Tammineedi, Tyson, and Woodward (the "Director Defendants"). Plaintiffs need only to allege demand futility as to four of these seven Directors Defendants.

187.     Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while Defendants Carrington, Buzby, Daley, and Tammineedi reaped nearly $22 million in proceeds from their insider sales. These sales occurred at suspicious times shortly after the conference call held on November 9. 2021 regarding Stem's third quarter sales and reaffirmed fiscal year guidance, but before February 24, 2022, when Stem announced disappointing financial results. Additional sales took place before January 5, 2023, when the truth was emerging, except for one sale by Defendant Carrington in March 2023. Even that sale occurred shortly before Bank of America downgraded the Company's shares in April 2023. This renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme. Director Defendants Carrington, Buzby, Daley, Morgan, and Tammineedi also face a substantial likelihood of liability for engaging in and/or otherwise facilitating the Overpayment Misconduct.

188.     Director Defendants Morgan, Daley, Carrington, Buzby, and Tammineedi, as

members of either STPK's or Legacy Stem's Board, solicited shareholder to vote to, *inter alia*, approve the Merger and the Incentive Plan, which they each materially benefitted (and continue benefit) from. They each considered and were involved in discussions leading up to the Merger, including during Board meetings held in connection therewith. They each were well aware of and had access to non-public information pertaining to Legacy Stem's business and future prospects. The misrepresentations and omissions set forth herein were material to shareholders in voting on approval of the Merger and Incentive Plan (among other proposals) who would not have approved such proposals had they been informed about the wrongdoing alleged herein. Under the Incentive Plan, the Company grants restricted stock awards and performance stock awards to executive officers, non-employee directors and other key employees of the Company, including each of the Director Defendants. Such awards provide material benefits to the Director Defendants that render them incapable of evaluating a demand with disinterestedness. Indeed, during the fiscal years ended December 31, 2021, and December 31, 2022, respectively, the Director Defendants received most of their compensation—and over $200,000, each (other than Carrington, who received significantly more), in stock awards, alone. Thus, the Director Defendants would be incapable of considering any demand challenging the Merger, the Merger Proxy, the Incentive Plan, or their own involvement in the Overpayment Misconduct and related claims. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

189.    Additional reasons that demand on Defendant Carrington is futile follow. Defendant Carrington has served as CEO and as Company director since April 2021. Prior to that, he served as the CEO and a director of Legacy Stem from December 2013 up until the Merger closed. Thus, Defendant Carrington is not independent and receives his primary livelihood from the Company. As Legacy Stem's CEO, and later the Company's, throughout the Relevant Period, Defendant Carrington was ultimately responsible for all the false and misleading statements and omissions that were made by or on behalf of the Company and Legacy Stem. He solicited the Merger Proxy, which contained false and misleading elements that contributed to shareholders approving, *inter alia*, the Merger and

the Incentive Plan, among other things. Such approvals allowed Defendant Carrington to reap significant profits tied to closing the Merger while effectuating the Overpayment Misconduct to the Company's detriment. By way of example, Defendant Carrington received over $40 million in compensation from the Company the year that the Merger closed in 2021, approximately $37 million of which comprised of stock awards. As the Company's highest officer, he conducted little, if any, oversight of the scheme to make false and misleading statements; consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes; and consciously disregarded his duties to protect corporate assets. Defendant Carrington also engaged in improper insider sales during the Relevant Period, reaping over $8 million in proceeds. Furthermore, Defendant Carrington is a defendant in the Securities Class Action. For these reasons, Defendant Carrington faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

190.    Additional reasons that demand on Defendant Morgan is futile follow. Defendant Morgan has served as the Company's Chairman of the Board from August 2020 until April 2021. He currently serves as Chair of the Compensation Committee. During the Relevant Period, Defendant Morgan served as managing member of the Sponsor and was the beneficial holder of more than 9 million Founder Shares, which would have been rendered worthless without a business combination. Thus, he was particularly interested in effectuating the Merger and concurrent Overpayment Misconduct. Defendant Morgan is personally responsible for the false and misleading statements contained in the Registration Statement, the 2020 10-K, and the Merger Proxy, which he signed, signed off on, or solicited. As a member of the Company's Board, he owed certain fiduciary duties, which he failed to undertake. Ultimately, his decisions, fueled by his own interests rather than the Company's, enabled the Overpayment Misconduct and caused him to be named as a defendant in the Securities Class Action. For these reasons, Defendant Morgan is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

191.    Additional reasons that demand on Defendant Buzby is futile follow. Defendant Buzby has served as a Company director since April 2021. He also serves as a member of the

Compensation Committee. Prior to that, he served on the Board of Legacy Stem from April 2010 until the Merger. Defendant Buzby has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements after the Merger, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, as a member of Legacy Stem's Board, he also solicited the Merger Proxy and aided and abetted the Overpayment Misconduct. Defendant Buzby also engaged in improper insider sales during the Relevant Period, reaping over $1.5 million in proceeds. His decisions were fueled by his own interests rather than the Company's. For these reasons, Defendant Buzby is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

192. Additional reasons that demand on Defendant Daley is futile follow. Defendant Daley has served as a Company director since August 2020. He also serves as a member of the Audit Committee. Defendant Daley has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements leading up to and after the Merger, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Daley is personally responsible for the false and misleading statements contained in the Registration Statement, the 2020 10-K, and the Merger Proxy, which he signed, signed off on, or solicited. Defendant Daley also engaged in improper insider sales during the Relevant Period, reaping over $6.3 million in proceeds. Furthermore, Defendant Daley is a defendant in the Securities Class Action. His decisions were fueled by his own interests rather than the Company's. For these reasons, Defendant Daley is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

193. Additional reasons that demand on Defendant Tammineedi is futile follow. Defendant Tammineedi has served as a Company director since April 2021. He also serves as a member of the

Audit Committee. Prior to that, he served on the Board of Legacy Stem from 2019 until the Merger. Defendant Tammineedi has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements after the Merger, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, as a member of Legacy Stem's Board, he also solicited the Merger Proxy and aided and abetted the Overpayment Misconduct. Indeed, Defendant Tammineedi, through his entity, Angeleno, was an investor of Legacy Stem and additionally benefited from the Merger through the stock-rollover, which rendered him a 5% owner of the Company's outstanding shares. Defendant Tammineedi also engaged in improper insider sales during the Relevant Period, reaping over $6 million in proceeds. His decisions were fueled by his own interests rather than the Company's. For these reasons, Defendant Tammineedi is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

194.    Additional reasons that demand on Defendant Tyson is futile follow. Defendant Tyson has served as a Company director since April 2021. She also serves as Chair of the Nominating Committee. She receives significant compensation from the Company for her service as a director, as set forth above. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements after the Merger, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.  For these reasons, Defendant Tyson is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

195.    Additional reasons that demand on Defendant Woodward is futile follow. Defendant Woodward has served as a Company director since April 2021. She also serves as a member of the Compensation Committee. She receives significant compensation from the Company for her service as a director, as set forth above. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements after the

Merger, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.  For these reasons, Defendant Woodward is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

196.    Additional reasons that demand on the Board is futile follow.

197.    As mentioned above, under the Incentive Plan, which is administered by the Compensation Committee and was approved in connection with the Merger Proxy (which contained materially false and misleading statements), each of the Director Defendants is eligible to receive long-term equity-based compensation, the amount and terms of which are approved by the Compensation Committee. During the fiscal year ended December 31, 2021, Defendants Buzby, Daley, Morgan, Tammineedi, Tyson, and Woodward each received RSUs valued at $200,963, whereas their "fees earned or paid in cash" ranged from $18,733 to $37,040. For the year ended December 31, 2022, those awards increased to $219.124, with cash compensation of $58,000-$99,000. These amounts are undoubtedly substantial in relation to the Director Defendants' compensation without them.

198.    Moreover, as the Company's current CEO, Defendant Carrington received a grant of 1,000,000 RSUs for the fiscal year ended December 31, 2021, under the 2021 Plan, valued at $10 million, and received an incredible $37,815,664 in stock awards that year, alone. Thus, the Merger and related Overpayment Misconduct took Defendant Carrington from a total compensation package of $4,956,211 to $40,565,992 (comparing 2020 compensation with 2021 compensation).

199.    Given their conflicted positions, the Director Defendants are unlikely to take action against those individuals, including the Individual Defendants, who caused Company shareholders to approve a plan that they each have materially benefitted from and continue to materially benefit from. Accordingly, the Director Defendants are not independent or disinterested, and demand upon them is futile and, therefore, excused.

200.    Moreover, certain of the Director Defendants had specified duties as members of Board committees, particularly those serving on the Audit Committee. Defendants Morgan, Daley

and Tammineedi further breached the additional duties they had as members of the Audit Committee to ensure the Company's disclosures were accurate, among other things.

201.    The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the others who were responsible for that wrongful conduct to attempt to recover for the Company any part of the damages the Company suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

202.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, the Director Defendants cannot claim exculpation from his violations of duty pursuant to the Company's charter (to the extent such a provision exists). As the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

203.    Thus, for all of the reasons set forth above, the Director Defendants and/or at least four of the Director Defendant, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
**Against Defendants Scheyer, Morgan, Wilds, Daley, Litowitz, Rogers, and Shaper for Violation of Section 14(a) of the Exchange Act**

204.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

205.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent

or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

206.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

207.    Under the direction and watch of the Individual Defendants, the Merger Proxy failed to disclose, *inter alia*, that: (1) Legacy Stem's business and competitive standing were overstated, particularly concerning its strategic partnerships and revenues tied to its software; (2) the post-Merger Company's business and financial prospects were also exaggerated. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

208.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Merger Proxy were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in the Merger Proxy, including but not limited to, the Merger itself and the Incentive Plan.

209.    As a result of the material misstatements and omissions contained in the Merger Proxy, Company shareholders voted to, among other things: (1) approve the Merger; and (2) approve the Incentive Plan, materially benefitting the Director Defendants, who joined the post-Merger Company and other Defendants.

210.    As a further result of the material misstatements and omissions in the Merger Proxy, Company shareholders were deprived of their right to make an informed decision in voting on the Merger, were deprived of their right to make an informed redemption decision regarding their STPK shares prior to the Merger, and were induced to accepting a loss-producing business combination.

211.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Merger Proxy.

212.    Plaintiffs, on behalf of Stem, have no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

213.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

214.    Each of the Individual Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of the Company's business and affairs.

215.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

216.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of the Company.

217.    In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the Overpayment Misconduct or aided and abetted in such misconduct.

218.    In further breach of their fiduciary duties, the Individual Defendants made false and misleading statements and omissions and failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

219.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

220.    Defendants Carrington, Tammineedi, Daley, Buzby, and Bush further breached their fiduciary duties to the Company by engaging in improper insider sales undertaken while they each possessed material non-public information, reaping over $25 million in ill-gotten proceeds.

221.    The Individual Defendants had actual or constructive knowledge of the Overpayment Misconduct and the materially false and misleading statements that enabled and disguised it for so long, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth

herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

222.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

223.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

224.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Stem has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

225.    Plaintiffs on behalf of Stem have no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Unjust Enrichment

226.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

227.    By their wrongful acts, violations of law, and/or false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants and the Sponsor were unjustly enriched at the expense of, and to the detriment of, Stem.

228.    The Individual Defendants either benefitted financially from the improper conduct, or

received bonuses, stock options, or similar compensation from Stem that was tied to the performance or artificially inflated valuation of Stem, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company. This also includes compensation received under the Incentive Plan, which certain Individual Defendants induced the Company's shareholders to approve through false and misleading representations, and the millions of dollars that certain Defendants cashed out in connection with the close of the Merger.

229. Plaintiffs, as shareholders and representatives of Stem, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, payments to the Individual Defendants under the Incentive Plan, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

230. Plaintiffs on behalf of Stem have no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Abuse of Control

231. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

232. The misconduct by the Individual Defendants alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

233. As a direct and proximate result of the Individual Defendants' abuse of control, Stem has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

234. Plaintiffs on behalf of Stem have no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

235. Plaintiffs incorporate by reference and reallege each and every allegation set forth

above, as though fully set forth herein.

236. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly-held corporation.

237. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Stem has sustained and will continue to sustain significant damages.

238. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

239. Plaintiffs on behalf of Stem have no adequate remedy at law.

**SIXTH CLAIM**
**Against the Individual Defendants for**
**Waste of Corporate Assets**

240. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

241. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

242. Certain of the Individual Defendants caused the Company to engage in the Overpayment Misconduct, to the detriment of STPK's shareholders and the Company. As noted below, certain of the Individual Defendants further aided and abetted this misconduct.

243. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused the Company to waste valuable corporate assets, including by, *inter alia*, by acquiring Legacy Stem on terms unfavorable to STPK shareholders, while Legacy Stem suffered from undisclosed issues and material risks. The Individual Defendants' misconduct has caused the Company to incur many millions of dollars of legal liability and/or costs to defend and settle unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the

Company and its products.

244.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

245.    Plaintiffs on behalf of Stem have no adequate remedy at law.

## SEVENTH CLAIM

**Against Defendants Carrington, Bush, Scheyer, Wilds, Morgan, Daley, Litowitz, Rogers, and Shaper for Contribution Under Section 10(b) and 21D of the Exchange Act**

246.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

247.    Stem and Defendants Carrington, Bush, Scheyer, Wilds, Morgan, Daley, Litowitz, Rogers, and Shaper are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Carrington's, Bush's, Scheyer's, Wilds', Morgan's, Daley's, Litowitz's, Rogers', and Shaper's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

248.    Defendants Carrington, Bush, Scheyer, Wilds, Morgan, Daley, Litowitz, Rogers, and Shaper, because of their positions of control and authority as officers and/or directors of the Company and/or Legacy Stem, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

249.    Accordingly, Defendants Carrington, Bush, Scheyer, Wilds, Morgan, Daley, Litowitz, Rogers, and Shaper are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

250.    As such, Stem is entitled to receive all appropriate contribution or indemnification from Defendants Carrington, Bush, Scheyer, Wilds, Morgan, Daley, Litowitz, Rogers, and Shaper.

**EIGHTH CLAIM**

**Against Defendants Scheyer, Wilds, Morgan, Daley, Litowitz, Rogers, and Shaper for Contribution Under Section 11(f) of the Securities Act and 21D of the Exchange Act**

251.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

252.    As a result of the conduct and events alleged above, the Company is a defendant in the Securities Class Action brought on behalf of Company shareholders, for claims brought under Sections 11 and 15 of the Securities Act.

253.    Federal law provides Stem with a cause of action against alleged joint tortfeasors under Section 11(f) of the Securities Act.

254.    The plaintiffs in the Securities Class Action allege that the Offering Documents issued in connection with the Company's Merger contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and omitted to state material facts required to be stated therein.

255.    Stem is the registrant for the shares issued pursuant to the Offering Documents. Defendants Scheyer, Wilds, Morgan, Daley, Litowitz, Rogers, and Shaper were responsible for the contents and dissemination of the Offering Documents.

256.    As issuer of the shares, Stem is strictly liable to the class action plaintiffs and the class for the misstatements and omissions.

257.    The plaintiffs in the Securities Class Action allege that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

258.    Defendants Scheyer, Wilds, Morgan, Daley, Litowitz, Rogers, and Shaper, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

259.    Accordingly, Defendants Scheyer, Wilds, Morgan, Daley, Litowitz, Rogers, and Shaper are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

260.    As such, Stem is entitled to receive all appropriate contribution or indemnification from Defendants Scheyer, Wilds, Morgan, Daley, Litowitz, Rogers, and Shaper.

## NINTH CLAIM
**Against Defendants Carrington, Bush, Buzby, and Tammineedi for Aiding and Abetting Breach of Fiduciary Duty**

261.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

262.    Defendants Carrington, Bush, Buzby, and Tammineedi aided and abetted the Individual Defendants at STPK leading up to the Merger, who breached their fiduciary duties to the Company in connection therewith and with the Overpayment Misconduct.

263.    Defendants Carrington's, Bush's, Buzby's, and Tammineedi's misconduct resulted in continuous, connected, and ongoing harm to the Company.

264.    Specifically, these Individual Defendants promoted the Merger by issuing and/or consenting to the issuance of false and misleading statements concerning Legacy Stem's software, operations, and business prospects. Moreover, Defendants Carrington, Bush, Buzby, and Tammineedi served on the Board and/or management of Legacy Stem, the Company's operational predecessor, and directly made statements during conference calls or in press releases and SEC filings which contained materially false and misleading statements promoting the Company's future operations and prospects.

265.    Defendants Carrington, Bush, Buzby, and Tammineedi are jointly and severally liable to the same extent as the Individual Defendants who served at STPK prior to and at the time of the Merger are liable for breaches of fiduciary duty as set forth herein or violations of any other laws.

266.    As a direct and proximate result of Carrington's, Bush's, Buzby's, and Tammineedi's

aiding and abetting of the other Individual Defendants' breaches of duty alleged herein, the Company has sustained and will continue to sustain substantial damages.

267.    Plaintiffs on behalf of Stem have no adequate remedy at law.

### **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiffs may maintain this action on behalf of Stem, and that Plaintiffs are adequate representatives of the Company;

(b)    Determining and awarding to Stem the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(c)    Directing Stem and the Individual Defendants to take all necessary actions to reform and improve Stem's corporate governance and internal procedures to comply with applicable laws and to protect Stem and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Stem to nominate at least four candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(d)    Awarding Stem restitution from Individual Defendants, and each of them;

(e)    Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(f)      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: August 26, 2023                    Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

By: */s/ Robert C. Moest*
Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: Rmoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
Eitan Kimelman
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com
          eitank@bgandg.com

*Counsel for Plaintiffs*

DocuSign Envelope ID: E0085D41-7623-46AA-8C30-B742E38EE76D

## **VERIFICATION**

I, Samhita Gera, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 25th day of August, 2023.

DocuSigned by:

CF385B635442408.

Samhita Gera

## <u>VERIFICATION</u>

I, Denish Bhavsar, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 25th __ day of August, 2023.

DocuSigned by:

*Denish Bhavsar*

925330D77A464FC...

Denish Bhavsar